714 P.2d 399

**Larry Wayne LARGE, Petitioner,**

v.

**SUPERIOR COURT of the State of Arizona, in and for the COUNTY OF MARICOPA, Honorable Howard F. Thompson, a judge thereof, and STATE of Arizona, DEPARTMENT OF CORRECTIONS, real party in interest, Respondents.**

No. 18273–SA.

Supreme Court of Arizona, En Banc.

Jan. 24, 1986.

Charles Arnold, Phoenix, for petitioner.

Robert K. Corbin, Atty. Gen., Richard Albrecht, Asst. Atty. Gen., Phoenix, for respondents.

FELDMAN, Justice.

■ Larry Wayne Large (petitioner) is a prisoner committed to the custody of the Arizona Department of Corrections (DOC) and confined at the Alhambra Treatment Unit (ATU), a mental health treatment facility. On April 23, 1985, Large filed a "Petition for an Order Prohibiting Forcible Administration of Psychotropic Drugs," Maricopa County Superior Court Cause No. MH 27765. The State of Arizona filed a motion to dismiss Large's petition. The trial court granted the state's motion and dismissed the petition. Petitioner sought relief by a special action, joining the trial judge, the state and the DOC as respondents.[1] Because petitioner has no adequate remedy by appeal and the question presented is of constitutional significance, we have accepted jurisdiction. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(1) and Rule 8, Ariz.R.P.Sp.Act., 17A A.R.S. In our review of the order granting the motion to dismiss, we must assume the truth of petitioner's allegations. *Donnelly Construction Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 186, 677 P.2d 1292, 1294 (1984). The dismissal can be upheld only if petitioner's claim could not entitle him to relief under any facts susceptible of proof. *Id.*

## FACTS

Petitioner pled no contest and was convicted of aggravated assault on 30 September 1982 and sentenced to five years in the state prison. He did not appeal and was placed in the custody of DOC.

On April 15, 1985, the Maricopa County Superior Court ordered petitioner transferred from the Arizona State Prison at Florence to the Alhambra Treatment Unit (ATU), a mental health inpatient treatment facility operated by DOC. The order was made pursuant to A.R.S. § 31–226,[2] the court having determined that petitioner

---

1. In Arizona practice, relief formerly granted by Writs of Prohibition, Mandamus or Certiorari is now granted by "Special Action." *See* Rule 1, Arizona Rules of Procedure for Special Actions, 17A A.R.S.

2. A.R.S. § 31–226, the only statute dealing with the treatment of mentally ill prisoners, provides in relevant part:

   A. If a prisoner confined in any facility operated by the state department of corrections displays symptoms of mental disorder to such a degree that transfer to the state hospital or a mental health inpatient treatment facility operated by the state department of corrections is necessary to insure adequate treatment, the psychiatrist of the facility, or if no psychiatrist is available, the physician at the facility, shall examine the prisoner and make a written report of his recommendations to the director of the state department of corrections. On receipt of a report that states that the psychiatrist or physician finds that the symptoms

   described in this section exist, the director of the state department of corrections shall file a petition with the superior court in the county in which the prisoner is incarcerated for transfer for treatment of the prisoner to the state hospital if the prisoner is a female or to a mental health inpatient treatment facility operated by the department if the prisoner is a male.

   B. At least ten days before the court conducts a hearing on the petition for transfer, the State Department of Corrections shall provide a copy of the petition and written notice of the hearing to the prisoner and written notice of the prisoner's rights at the hearing.

   C. At least five days before the hearing, if the prisoner has not employed counsel, the court shall appoint counsel or an independent advisor to represent the prisoner at the hearing. On application by the prisoner the court shall also determine the necessity for any expert testimony by medical witnesses and authorize any necessary appointment and compensation

"suffer[ed] from a mental disorder to such a degree that transfer to the treatment facility was necessary to ensure adequate treatment." In fact, petitioner had already been physically transferred to ATU about seven months earlier.

From the date of his admission at ATU in September 1984, four types of records were kept on petitioner: (A) a "Comprehensive Treatment Plan" form with spaces for filling in diagnoses and treatment; (B) a "Physician's Orders" form for indicating "medicines, diet, etc."; (C) a "Physician's Progress Record" form; and (D) a "Problem List" form. Despite this seemingly elaborate system to observe and record information, the record on petitioner in the five months from September, 1984 until February 25, 1985 is sketchy. His Comprehensive Treatment Plan entry for the day of admission indicates petitioner had been diagnosed as a "schizoaffective/paranoid," for which the treatment was to

seclude, restrain, 4-point[3] in progressively increasing increments (dangerous to

others) .... Any behavior or threats should be interpreted as dangerous and he must be controlled until he agrees to do so himself. Reverse procedure back out in increments.

For the next five months petitioner apparently evidenced no behavior or threat that could be interpreted as dangerous, because the Comprehensive Treatment Plan entries state only "treatment team review," signed by each of the team members. The Physician's Orders form shows no medications were prescribed during this period. The Progress Record gives no description of petitioner's behavior other than his "refusal for Rx" and a statement that he had "not reached the point where he is in need of treatment against his will." Physicians' Progress Record for October 9, 1984. Finally, his Problem List revealed only that:

1. On admission in September, 1984 petitioner refused to sign the voluntary admit form and to receive medication and his behavior was "disruptive/assaultive."

for these witnesses at the state's expense. Notice shall be given to the state hospital if the prisoner is female, and the state hospital shall be provided with an opportunity to participate in the hearing as an interested party, if it so desires.
D. At the hearing, the prisoner or his representative may call witnesses to testify and may confront and cross-examine witnesses called by the department except on a finding of good cause for not permitting such presentation, confrontation or cross-examination.
E. If the prisoner is determined to be suffering from a mental disorder to such a degree that transfer to the state hospital or a mental health inpatient treatment facility operated by the state department of corrections is necessary to ensure adequate treatment, the court shall order and direct that the prisoner be transferred for treatment to the state hospital in the legal custody of the state department of corrections if the prisoner is a female or to a mental health inpatient treatment facility operated by the state department of corrections if the prisoner is a male. The transfer of the prisoner to the state hospital shall be made by the state department of corrections. The court order must be in writing and state the evidence relied on and the reasons for transferring the prisoner.
F. The superintendent of the state hospital shall provide the state department of corrections with a quarterly report of the condition

of the prisoner. The superintendent of the state hospital and the director of the state department of corrections shall also provide the superior court in the county which has jurisdiction over the transfer proceeding with a quarterly report of the condition of the prisoner.

3. DOC policy # 401.17 pertaining to Four-Point Restraints of Juveniles was submitted with the Petition for Special Action. None was submitted on adults, thus we do not know if such a policy exists; presumably it would be the same as that for juveniles, which defines Four-Point Restraints as follows:

"Method I Four-Point Restraints": The juvenile is placed face down, and either spread-eagled on the bed and secured by each wrist and ankle being individually secured to the corresponding corner of the bed, or has his/her arms along their sides with leather restraints placed on each wrist and secured to the bed. Feet are then placed together, with leather restraints affixed to each ankle and secured to the foot of the bed. Additionally, straps may be placed around the shoulders or chest to ensure control of back arching.
"Method II Four-Point Restraint": The juvenile will be placed in a sitting position on the floor, with knees raised. The left wrist will be secured to the right ankle, and the right wrist secured to the left ankle.

2. In November, 1984 he "manipulate[d] religious ideas to get his needs met"; (a problem that was "resolved" on April 17, 1985); he denied mental illness or need for medication and threatened legal action.

3. In December he had a small laceration on his right thumb and a pain in his left wrist; (both "resolved" January 30, 1985).

*Drug Administration*

Forced drug treatment appears to have been triggered by an "altercation" between petitioner and another patient on 25 February, 1985. Large contended at the time that the altercation was the other patient's fault. Because the physician concluded that the occurrence "clearly" came about as a "result of patient's continued aggressively psychotic behavior," he decided that "emergency treatment [was] required [and he began] Navaneization against patient's will to preclude further harm to patient by his own dangerous action." "Navaneization" appears to be newspeak for administration of Navane, a psychotropic drug, also referred to as a neuroleptic or antipsychotic drug. The Physician's Orders entry for February 25 indicates no specific medications or dosages; it states only "observe and chart behavior/response with meds." Three days later the entries show petitioner had been on Navane continuously and was

> evaluated 72 hours after emergency Rx against his will. Patient appeared anxious but very cooperative, appropriate, much less delusional. Effects of Navane have been pronounced in modifying his psychotic behavioral responses. He still says he will not sign in and will not agree to taking medication. Assured we will continue Rx until court hearing makes decision regarding continued Rx.[4]

On that day the doctor prescribed:

1. Navane, 20 mg. by mouth twice a day, or if refused, 10 mg. by intramuscular injection.

2. Artane, 10 mg. twice a day.

3. Cogentin, 2 mg. by intramuscular injection every five hours if symptoms are not relieved by Artane.

4. Symmetrel, 100 mg. twice a day.

Other than the antipsychotic drug, Navane, the drugs prescribed were for treating adverse side effects of antipsychotics.

*Side Effects*

Not all of the side effects (called extrapyramidal reactions) of antipsychotic drugs are yet known. Two of the known extrapyramidal reactions are called akathisia and akinesia.

> Akathisia is characterized by "involuntary motor restlessness, constant pacing, an inability to sit still, often accompanied by fidgeting, chewing, lip movements and finger and leg movements." ... Because the anxiety induced by this restlessness is easily mistaken for underlying psychotic anxiety, it is frequently mistreated by increasing the dosage of antipsychotic medication. Akathisia may be treated with anti-parkinsonian drugs but many cases respond poorly.

Comment, *Antipsychotic Drugs and Fitness to Stand Trial*, 52 U.CHI.L.REV. 773, 785–86 (Summer 1985) (citations to medical references omitted). Akinesia, on the other hand, results in lack of spontaneity, lifelessness, an inability to participate in usual social activities and a disinclination to speak. *Id.* at 784–85. A person receiving antipsychotic medication may therefore evidence both the emotional apathy of akinesia as well as the physical restlessness and distraction symptomatic of akathisia. *See id.* at 786. Our courts have noted other extrapyramidal effects such as dystonia (spasmodic muscle reaction frequently involving a twisting of the neck) and a pseudo-parkinsonian syndrome (mask-like face, rigid hands). *Anderson v. State*, 135 Ariz.

---

4. The reference was to the hearing required under A.R.S. § 31–226 to transfer Large officially to ATU, where he already was. The court hearing was eventually held April 15, 1985, about 7 weeks after drug administration was commenced. The court order made following the hearing did not mention "continued Rx" against the patient's will.

578, 580, 663 P.2d 570, 572 (App.1983). The most serious side effect of antipsychotic drugs is irreversible tardive dyskinesia, which may develop after extended use of the drugs. Gelman, *Mental Hospital Drugs, Professionalism and the Constitution*, 72 GEO.L.J. 1725, 1742–43 (1984). In tardive dyskinesia

> [t]he tongue sweeps from side to side, the mouth opens and closes, and the jaw moves in all directions. Fingers, arms, and legs may display comparable movements; swallowing, speech, or breathing can be affected as well. The movements are uncontrollable although their intensity varies from case to case. In severe cases, the involuntary movements impede walking and even digestion. Health can be endangered, and often the victim's appearance becomes grotesque. Tardive dyskinesia is common: estimates of the disorder's prevalence rates (the proportion of patients with tardive dyskinesia at any particular time) range as high as sixty-five percent; fifteen to twenty percent is a widely accepted estimate.

*Id.* (citing primarily to AMERICAN PSYCHIATRIC ASSOCIATION, TARDIVE DYSKINESIA: REPORT OF THE TASK FORCE ON LATE NEUROLOGICAL EFFECTS OF ANTIPSYCHOTIC DRUGS (1979 ) (other citations omitted).

Petitioner's records do not state whether he exhibited side effects, but we assume it was the manifestation of side effects that prompted the medications to treat them. Later records likewise do not indicate whether these drugs were effective in controlling side effects. The February 28 orders were periodically reassessed and ordered continued with an upward adjustment of Symmetrel to 300 mg. daily on March 7th and with the addition of two others—Benadryl and Thorazine in mid-April of 1985. Benadryl, according to the PHYSICIANS' DESK REFERENCE (38th ed. 1984), is indicated for mild cases of parkinsonism, including drug-induced cases. Thorazine is a tranquilizer used to manage manifestations of psychotic disorders. All the drugs mentioned were administered to petitioner against his will: he consistently refused to sign informed consent for voluntary treatment and repeatedly requested to be taken off the medications. It appears that the drugs were administered to manage rather than to treat petitioner. This management procedure had been established months before the altercation:

> ... he can be secluded, restrained, 4-pointed and even given a PRN [drugs as necessary] for irritating, agitating behavior or any behavior that is antitherapeutic—for ward treatment milieu. *These actions are for management and have nothing to do with Rx against his will.*

Physicians Progress Record, October 9, 1984. (Emphasis added.)

Once systematic administration of drugs began on February 25, petitioner tried to terminate it, evidently because of the drugs' severe physical and emotional side effects. On different occasions he complained to the prescribing physician that "his system does not tolerate psychotics", that "Navane gives him the torments and tight arms and legs," that "Symmetrel was causing problems 'upsetting him inside,' " and that the medications were causing him problems with restlessness. Despite petitioners' supplications, the involuntary administration of medication continued, the physician explaining that it would continue until the future court transfer hearing under A.R.S. § 31–226.

*The Petition*

After the April 15, 1985 order legally transferring petitioner, ATU continued to force him to take psychotropic drugs. On April 23, 1985, Large filed his "Petition for Order Prohibiting Forcible Administration of Psychotropic Drugs" in the Superior Court. In his petition Large claimed that the non-emergency, forcible administration of psychotropic drugs was improper in the absence of: (1) a written treatment plan prepared by the ATU staff responsible for petitioner's care; (2) written procedures promulgated by the ATU governing the use of psychotropic drugs in a non-emer-

gency situation and against the will of the inmate patient; or (3) regulations promulgated by the DOC governing the use of psychotropic drugs in such situations. The state filed a motion to dismiss the petition (Rule 12(b)(6) Ariz.R.Civ.P., 16 A.R.S.) on the grounds that petitioner had failed to state a claim upon which relief could be granted. No evidentiary hearing was held. On July 1, 1985, after oral argument, the trial court granted the state's motion and dismissed Large's petition.

In his petition to this court for special action petitioner does not challenge his transfer to the mental health treatment facility. He argues, rather, that in the absence of procedural restrictions on involuntary pharmacological restraints such as those imposed on the state with respect to *civilly* committed mental patients by Title 36 (A.R.S. §§ 36–511 to 36–513), DOC's actions violate due process. The DOC admits it is forcibly administering the drugs to petitioner against his will, but denies that any rule of law is thereby being violated or that petitioner is being subjected to continuing or irreparable harm. DOC contends that nothing prohibits it from administering psychotropic drugs to the unwilling.

In the petition for special action and the state's response thereto, both parties submitted evidentiary material and each has argued that the material does or does not establish certain facts. We are not finders of fact and consider, instead, only the legal issues framed by the case in its present posture. The facts discussed above on the drugs, their effects and their administration are recognized or not controverted. Narrowly described, the ultimate issue is whether the state may force prisoners to ingest drugs which may endanger their health, when such drugs are not given in an emergency or for purposes of medical treatment, but only for restraint. If not, petitioner is entitled to the opportunity to prove his case. If so, then the trial court did not err in dismissing the petition.

## MAY CONVICTED PRISONERS REFUSE ANTIPSYCHOTIC DRUGS?

Because petitioner did not articulate whether he was proceeding under the federal or state due process clause, and because the provisions of our state constitution settle the matter, we address only the state constitutional issue. *See City of Portland v. Jacobsky*, 496 A.2d 646, 648 (Me.1985). In construing the Arizona Constitution we refer to federal constitutional law only as the benchmark of minimum constitutional protection. *See Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983); *State v. Chaisson*, 125 N.H. 810, 486 A.2d 297, 303 (1984).

■ We consider for the first time the treatment of the mentally ill prisoner under the due process clause of the Arizona Constitution. The Declaration of Rights provides:

> No person shall be deprived of life, liberty, or property without due process of law.

Ariz. Const. art. 2, § 4. *Vruno v. Schwarzwalder*, 600 F.2d 124 (8th Cir. 1979) suggests that a procedural due process analysis is two tiered:

> The first stage of analysis requires a determination of whether the person seeking relief has been deprived of a [protected] liberty ... interest.... If the court concludes that the due process clause applies to the particular interest at stake, it proceeds to the second stage, which is the identification of the procedures necessary to safeguard that interest.

*Id.* at 129 (citations omitted). We think that a complete due process analysis must include consideration of the competing state interest that encroaches on the individual liberty or property right. *See, e.g., Jacobson v. Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905). Thus, in deciding whether a person has been deprived of a protected liberty or property interest without due process of law we use a three-tier analysis: (1) does the state's action implicate a protected liberty interest; (2) if so, does the state's interest justify the

degree of infringement on the liberty interest; and (3) if so, is appropriate process provided to assure that liberty is not arbitrarily deprived? The answer to the first two questions are matters of substantive due process; to the third, procedural due process. We evaluate the private interest at stake, the state's interest, the nature of the challenged procedures, and the risk that those procedures will lead to erroneous results. *In re Maricopa County Juvenile Action No. JD–561*, 131 Ariz. 25, 27, 638 P.2d 692, 694 (1981). It is our task to weigh and balance the competing interests. *Id.*

1. *Liberty interest in avoiding involuntary administration of psychotropic drugs.*

■ Freedom from bodily restraint imposed by arbitrary government action has long been recognized as the core of the liberty protected by due process. *Youngberg v. Romeo*, 457 U.S. 307, 316, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982). To the extent that medication is administered forcibly for the purpose of controlling behavior, it is a bodily restraint insubstantially different from the shackles of old. *See* Gelman, *supra* at 1727. An individual thus has a similar due process right to freedom from arbitrary forcible administration of chemical restraints. *Anderson v. State*, 135 Ariz. 578, 582, 663 P.2d 570, 574 (App. 1983). Notwithstanding his status as a convicted prisoner, petitioner retains the right to due process protection against arbitrary government action. Ariz. Const. art. 2, § 16; *Howard v. State*, 28 Ariz. 433, 435, 237 P. 203, 204 (1925). Liberty from arbitrary chemical restraint survives criminal conviction and incarceration just as liberty from arbitrary bodily restraint survives both civil involuntary commitment and criminal conviction and incarceration. *See Youngberg v. Romeo*, 457 U.S. at 316, 102 S.Ct. at 2458; *Anderson v. State*, 135 Ariz. at 582, 663 P.2d at 574.

■ We hold, therefore, that the Arizona Constitution's due process clause protects convicted prisoners' right to refuse arbitrary government administration of psycho-tropic drugs. This right of refusal is not absolute. The state may infringe on this and other rights of prisoners when it has legal reason to do so and when the procedures are proper. *See* A.R.S. § 13–904. The next questions we address are whether the state's interest outweighs this individual liberty interest and, if so, what process is due.

2. *Competing State Interest: Institutional Order and Security.*

Maintaining institutional security and preserving internal order and discipline are essential goals of the DOC in operating penal institutions. DOC cannot pick and choose inmates. It is its duty to receive, hold and accept responsibility for all convicted felons put into its custodial care. *Dupnik v. MacDougall*, 136 Ariz. 39, 41, 664 P.2d 189, 191 (1983). We recognize that the department faces tremendous obstacles in the effective discharge of these duties and that the individual problems are not susceptible of easy solutions. *See Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). The Herculean nature of the task is compounded when, as at the ATU, the prisoners are mentally disturbed. Measures that may be adequate to achieve legitimate goals in a prison may be inadequate in a mental health treatment facility. Restraints, physical and chemical, are no doubt sometimes necessary. Inherent in the status of a prisoner is the concept that involuntary restraints will be imposed.

3. *Constitutional Validity of Forcible Administration of Psychotropic Drugs to Mentally Disturbed Prisoners.*

■ Having established both the DOC's right of forcible administration of psychotropic drugs and petitioner's constitutionally protected liberty interest, the question we now face is whether under these facts the state's action is so arbitrary that it violates the due process clause of the Arizona Constitution by posing an unreasonable risk of error. *Supra* at 405–06. Due process simply requires that government deprivation of a liberty interest be

both substantially related to the purpose it is to serve and not excessive in response to the problem addressed. *American Federation of Labor v. American Sash & Door Co.*, 67 Ariz. 20, 28, 189 P.2d 912, 917 (1948), *aff'd* 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222 (1949). As we stated the test in *Valley National Bank of Phoenix v. Glover*, 62 Ariz. 538, 159 P.2d 292 (1945):

> Due process, when applied to substantive rights, is interpreted to mean the state is without right to deprive a person of life, liberty or property by an act that has no reasonable relation to any proper governmental purpose, or which is so far beyond the necessity of the case as to be an arbitrary exercise of governmental powers.

*Id.* at 553, 159 P.2d at 298–99; *see also Bell v. Wolfish, supra.*

We now turn to the facts to determine whether DOC's procedures have sufficient safeguards to prevent erroneous and arbitrary denial of petitioner's substantive rights.

■ Legitimate and essential goals of the DOC may necessitate the suspension or limitation of the liberty of prisoners without violating due process. This constitutional notion has been codified in A.R.S. § 13–904 which provides in pertinent part:

> A. A *conviction* for a felony *suspends the following civil rights* of the person sentenced:
> 1. The right to vote.
> 2. The right to hold public office of trust or profit.
> 3. The right to serve as a juror.
> 4. During any period of imprisonment *any other civil rights the suspension of which is reasonably necessary for the security of the institution* in which the person sentenced is confined or for the reasonable protection of the public.

(Emphasis added.) Thus, for example, DOC officials may validly intercept and examine communications of inmates in order to prevent the transfer of contraband. *State v. Jeffers*, 135 Ariz. 404, 414, 661 P.2d 1105, 1115 (1983), *cert. denied*, 464

U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983). Nevertheless it has long been recognized that even essential powers of the state to preserve the peace are not unfettered. *See Culinary Workers and Bartenders Local Union No. 631 v. Busy Bee Cafe, Inc.*, 57 Ariz. 514, 518, 115 P.2d 246, 248 (1941). Thus, despite the Department's broad discretion as to the treatment of prisoners, the discretion can be abused. *Cardwell v. Hogan*, 23 Ariz.App. 475, 476, 534 P.2d 283, 284 (1975) (must be reasonable).

■ To determine if DOC's actions have violated due process we must balance the individual's liberty interest against the state's reasons and need for its suspension. *See Youngberg v. Romeo*, 457 U.S. at 320, 102 S.Ct. at 2460. DOC's first reason to justify the forcible administration of the drugs is security. It argues that the burden is on petitioner to show that "the administration of psychotropic drugs [was] not reasonably necessary for the security of the institution in which petitioner is confined." (Response at 3, 7). DOC claims that petitioner has not and cannot meet this burden because "the record below demonstrates that petitioner's behavior was highly disruptive and violent, [and] includes threats and assaults of other inmates and staff." (*Id.* at 7.) The source of this information is not ATU's contemporaneous records but the prescribing physician's affidavit given months after initiation of forcible administration of drugs. Petitioner claims, on the other hand, that in the absence of an emergency threatening the security of the institution, drugs may be administered only for treatment, not for management. Petitioner submitted ATU's records to show that neither emergency nor treatment motivated the administration of drugs. These evidentiary questions are not for us to decide. The trial court dismissed for failure to state a claim, not for failure to prove the case.

■ Absent a true emergency, we do not believe that forcible medication with dangerous psychotropic drugs "is reasonably necessary for the security of the institu-

tion" as required by A.R.S. § 13–904. Even assuming that petitioner's conduct presented the officers of ATU with a legitimate security problem, we think the risk of harm from the forcible administration of these drugs is too great to pass muster under our constitution unless done pursuant to procedural safeguards designed to prevent arbitrary and erroneous use of the drugs. We agree with the United States Court of Appeals for the Tenth Circuit which has stated:

> In view of the severe effects of antipsychotic drugs, forcible medication cannot be viewed as a reasonable response to a safety or security threat if there exist "less drastic means for achieving the same basic purpose." Our constitutional jurisprudence long has held that where a state interest conflicts with fundamental personal liberties, the means by which that interest is promoted must be carefully selected so as to result in the minimum possible infringement of protected rights.

*Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984) (citations omitted). We hold, therefore, that the forced, non-emergency administration of psychotropic drugs which present serious dangers of significant side effects is not justified by security considerations alone. Ordinarily "security" and discipline may be insured by more conventional methods such as incarceration or isolation. Thus, forcible medication with dangerous drugs should be limited to specific emergencies under procedural safeguards.

DOC's second justification for forcibly drugging petitioner is that it was done as treatment. It argues that petitioner's involuntary medication is not improper because it was administered pursuant to professional judgment. The department relies on numerous federal cases for the proposition that forcible administration of antipsychotic drugs is constitutional whenever the order results from professional judgment seeking to prevent the patient from endangering himself or others. *Youngberg v. Romeo,* 457 U.S. at 307, 102 S.Ct. at 2452 (1982); *Bee v. Greaves, supra; Johnson v. Silvers,* 742 F.2d 823 (4th Cir.1984); *Rogers*

*v. Okin,* 738 F.2d 1 (1st Cir.1984); *Rennie v. Klein,* 720 F.2d 266 (3d Cir.1983).

■ We disagree with the conclusion the department draws from these cases. The medical nature of the procedure does not justify dispensing with due process requirements. *Vitek v. Jones,* 445 U.S. 478, 495, 100 S.Ct. 1254, 1265, 63 L.Ed.2d 552 (1980). The mere fact that a doctor authorized the forcible administration of the drugs is not conclusive. Due process requires that courts "make certain" that proper professional judgment was "in fact" exercised in the denial of a liberty interest. *Youngberg v. Romeo,* 457 U.S. at 321, 102 S.Ct. at 2461. Deference to professional judgment is not blind; it must be based on evidence that the responsible professional was guided in his judgment by evaluation of the relevant circumstances, including the severity of the individual's behavioral problems and the likely effects of these particular drugs on that individual. *See Bee v. Greaves,* 744 F.2d at 1396.

We do not attempt to draw factual inferences. ATU's records establish only that Large was being given normal to maximum dosages of several dangerous drugs against his will over a period of months. They do not state what medical purpose necessitated or indicated the long course of treatment or why additional highly potent drugs were necessary in March and April. The doctor who prescribed this drug regimen may have had very good psychiatric reasons to do so. The drugs may have been medically indicated for petitioner's treatment. But they may have been merely convenient for the management of the facility.

■ We also cannot determine, from ATU's records on petitioner, to what extent his psychiatric problems were helped or harmed by the drugs. We are asked to rely on the unexplained and unarticulated judgment of the prescribing doctor that forced medications were appropriate and effective. Our constitution does not permit such blind reliance. Due process demands guarantees that those civil rights not sus-

pended by imprisonment will not be deprived erroneously or arbitrarily. We have discovered no existing procedures to safeguard petitioner from forced acceptance of drugs which are unneeded medically and which may produce very serious and permanent side effects. We have been cited to none. The absence of procedural safeguards under the circumstances is a violation of the state's due process obligations. *Bennett v. Arizona State Board of Public Welfare*, 95 Ariz. 170, 172–73, 388 P.2d 166, 167–68 (1963). We also hold, therefore, that forcible administration of dangerous drugs to treat a mentally ill prisoner in non-emergency situations violates Arizona's due process guarantee unless it is done pursuant to professional judgment evidenced by a treatment plan which complies with legislative or departmental regulations governing the circumstances for such a forced use of drugs for medical treatment.

## SUMMARY AND CONCLUSION

The freedom of convicted and sentenced criminals is subordinated to the state's interest in enforcing the sentence. The state may do anything and everything reasonably necessary to the safe confinement of the prisoner. It may shackle, isolate or otherwise restrain him physically if necessary to prevent escape or injury. But its power with regard to such physical restraints is not unlimited. The same principle applies to the type of chemical restraints under consideration here. The state may forcibly inject this prisoner with drugs carrying the potential for causing serious side effects in any *emergency* where such a procedure is necessary, just as it may shoot him if justified in an emergency. But no such emergency can be claimed here, for this prisoner has been medicated against his will for months. The state may similarly administer psychotropic drugs with their known and unknown dangerous properties to this prisoner for purposes of *treatment* if it is authorized by proper procedural regulations, and if the drug administration is approved by qualified medical judgment *and* is prescribed

for valid medical reasons. Valid reasons include cure or control of the diagnosed mental disorder; they do not include chemicals to keep prisoners docile and manageable regardless of potential serious physical and emotional consequences. The legislature has the authority and power to provide for punishment and incarceration of criminals. It does not have and cannot give to the Department of Corrections the power to immobilize and warehouse prisoners by using chemicals with known adverse consequences, only to release them—possibly severely impaired—at the end of their sentence. Such an Orwellian result is not permitted by our state constitution.

In enacting A.R.S. §§ 36–511 to 36–513 the legislature recognized the necessity of specific procedures to govern the forcible administration of chemical restraints to patients in mental health institutions. Yet these statutes protect only the civilly committed patient, not the criminally committed prisoner, despite the fact that even convicted prisoners are entitled to due process protections for their limited liberty interest.

If the state has forced dangerous psychotropic drugs on petitioner for the purpose of managing his behavior in non-emergency situations, it has violated a liberty interest protected by Arizona's due process clause. If it has administered such medications, against petitioner's will, for treatment but without any formulated plan and without safeguards imposed by statutory law (such as §§ 36–511 to –513), administrative regulation or court order, then it has violated procedural due process. In either event, we find that petitioner has stated a claim and is entitled to prove his case, if he can.

We are well aware that we leave the state power to administer the drugs in question against the prisoner's will in non-emergency situations, if done for the purpose of treatment and with proper procedural safeguards against abuse. The dissent persuasively argues that even prisoners have an absolute right to be free from non-consensual medication with dangerous

240

drugs. We believe that the prisoner's status does not permit so absolute a right of privacy. In any event, petitioner has not sought so broad a ruling.

Relief is granted. The order dismissing Large's petition for failure to state a claim is vacated. The matter is remanded to the trial court for proceedings not inconsistent with this opinion.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS, J., concur.

CAMERON, Justice, dissenting.

I write separately to express my opinion that the majority does not go far enough in protecting this petitioner's right of privacy.

The majority would proscribe the forceful administration of dangerous drugs only in non-emergency situations. Such drugs could be forcefully administered if done pursuant to professional judgment evidenced by a written treatment plan in compliance with legislative or department regulations governing such a forced use of drugs for medical treatment.

I fully agree with the statement of the First Circuit Court of Appeals that it "seems to us to be an intuitively obvious proposition: a person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs." *Rogers v. Okin,* 634 F.2d 650, 653 (1st Cir.1980) (footnote omitted), vacated and remanded *Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982).

Although some courts have considered this problem a due process (liberty interest) question, *Rennie v. Klein,* 720 F.2d 266 (1983), and others, a cruel and unusual punishment question *Mackey v. Procunier,* 477 F.2d 877 (9th Cir.1973), I believe it is primarily a matter of right to privacy. As the Massachusetts Supreme Court has stated:

"[A] person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs." *Rogers* II, supra at 653. The source of this right according to *Rogers* II, supra, lies in the "Due Process Clause of the Fourteenth Amendment ..., most likely as part of the penumbral right to privacy, bodily integrity, or personal security." *Id.* Other courts have discussed in individual's First Amendment right to maintain the integrity of his mental processes. See *Scott v. Plante,* 532 F.2d 939, 946 (3d Cir.1976); *Mackey v. Procunier,* 477 F.2d 877, 878 (9th Cir.1973); *Rogers* I, supra at 1366–1367. We ground this right firmly in the constitutional right to privacy, which we have previously described as "an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life." *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 742, 370 N.E.2d 417 (1977).

*Guardianship of Roe,* 383 Mass. 415, 433 n. 9, 421 N.E.2d 40, 51 n. 9 (1981).

In Arizona, the right to privacy is expressly given in the constitution. Ariz. Const. art. 2 § 8. It is my opinion, that the right to privacy contained in the Arizona Constitution must include the right to bodily integrity and personal security, thus allowing a person to refuse the ingestion or injection of dangerous drugs. *See Anderson v. State,* 135 Ariz. 578, 583, 663 P.2d 570, 575 (App.1982) (state law requires more than minimal federal constitutional requirements).

These drugs are conceded by the state to be very powerful and dangerous. The side effects are well known,

such as dysfunction of the central nervous system called extra pyramidal symptoms; blurred vision, dry mouth and throat, constipation or diarrhea, palpitation, skin rashes, low blood pressure, faintness, fatigue; also sometimes permanent states such as akinesia, akathesia and tardive dyskinesia characterized by rhythmical, repetitive involuntary

movements of the tongue, face, mouth or jaw sometimes accompanied by other bizarre muscular activity. Also they may be responsible for a condition wherein white blood cells disappear called agranulocytosis which is fatal in 30% of the cases.

*In Re K.K.B.* 609 P.2d 747, 748 n. 3. (Okla. 1980) Other possible side effects include: drowsiness, fainting, loss of sexual desire, skin rashes, skin discoloration, cardiovascular changes and occasionally sudden death. *Guardianship of Roe,* 383 Mass. at 438, 421 N.E.2d at 53.

The state seeks to justify the use of these mind-altering drugs based on security reasons and as a necessary manner of treatment. While these are valid state interests they do not rise to the level of overriding a person's right to privacy. As the Oklahoma Supreme Court stated,

> [F]orcible anti-psychotic medication of a patient in a state hospital is not necessary to protect the general public. The public is protected by commitment. If there is no emergency, hospital personnel are in no danger; *the only purpose of forcible medication in these circumstances would be to help the patient.* But the basic premise of the right to privacy is the freedom to decide whether we prefer to be helped, or to be left alone.

*In Re K.K.B.,* 609 P.2d at 751 (original emphasis). Any individual, even a state prisoner, should have the right to determine whether he wishes to undergo a method of treatment involving these dangerous drugs. While his refusal to take such drugs may impede his treatment and be a negative factor in such determinations as parole and sentence reduction, nevertheless his right to refuse should be absolute.

I note in conclusion that Mr. Large has never been legally declared incompetent, but merely in need of more extensive treatment than is possible at the state prison. A.R.S. § 31–226. It is frightening to even think that the state may be able to forcibly administer dangerous, mind-altering drugs to a mentally competent person. As noted by Chief Justice Hennessey in *Guardianship of Roe, supra,* if these drugs were mistakenly administered to a nonpsychotic individual, that person might develop a "toxic psychosis" causing him to suffer symptoms of psychosis. 383 Mass. at 437, 421 N.E.2d at 53. These symptoms assumedly could then justify continued treatment with the drugs. Such a scenario is shockingly repugnant to a free society. For these reasons, I am convinced that an individual's right to privacy must allow him the absolute right to refuse the forcible administration of dangerous drugs as a form of treatment.