IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO
_____

IN RE PIMA COUNTY MENTAL HEALTH NO. 20200860221

No. 2 CA-MH 2021-0003
Filed February 3, 2022
_____

Appeal from the Superior Court in Pima County
No. MH20200860221
The Honorable Alyce L. Pennington, Judge Pro Tempore

**VACATED**
_____

COUNSEL

Pima County Mental Health Defender's Office, Tucson
By Molly Pettry
*Counsel for Appellant*

Laura Conover, Pima County Attorney
By Tiffany Tom, Deputy County Attorney, Tucson
*Counsel for Appellee*

_____

**OPINION**

Vice Chief Judge Staring authored the opinion of the Court, in which Judge Eckerstrom concurred and Presiding Judge Espinosa dissented.

_____

S T A R I N G, Vice Chief Judge:

¶1        In this appeal from an involuntary-treatment order, appellant G.B. argues the trial court committed reversible error because the physicians' affidavits in support of the petition for court-ordered treatment failed to include the results of her physical examinations, in violation of A.R.S § 36-533(B).  She also contends the physicians failed to consider

pertinent information about her particular circumstances, rendering the evidence insufficient to find her persistently or acutely disabled (PAD). Because the physicians' affidavits did not strictly comply with § 36-533 and were insufficient as a matter of law, we vacate the involuntary-treatment order.

## Factual and Procedural Background

¶2        We view the facts in the light most favorable to sustaining the trial court's order. *In re Maricopa Cnty. Mental Health No. MH 2008-001188*, 221 Ariz. 177, ¶ 14 (App. 2009). In February 2021, G.B. transferred her care to St. Mary's Hospital from Tucson Medical Center (TMC) because she felt TMC was not providing the help she needed for her unexplained gastrointestinal complaints. Specifically, she opposed psychiatric treatment recommended at TMC. G.B., who was seventy years old and weighed approximately eighty-three pounds, was diagnosed at St. Mary's with a delusional disorder, as well as malnutrition and cachexia.[1] She refused the medications prescribed for the delusional disorder. Also at St. Mary's, she received a dietary consultation to assess her nutritional needs, and, despite expressing an interest in gaining weight, she repeatedly complained that the recommended food was not what she had ordered or needed.

¶3        According to Randy Claxton, a social worker at St. Mary's, G.B. "clearly had believed . . . that the doctors and the team were against her." Despite the doctors' efforts to develop a rapport with G.B., she continued to believe they were "trying to harm her with the medication and treatment [they] were prescribing," which included Depakote, Haldol, and Risperdal. After G.B. had been at St. Mary's for a little over a week, she insisted on being discharged, but her medical team felt that they had not made any progress because she was unwilling to participate in the prescribed treatment and her weight was "in a dangerous area." As a result, Claxton filed an application for an involuntary evaluation of G.B., alleging that she was gravely disabled or PAD. The next day, James Ojeda evaluated G.B. and completed a pre-petition screening report, concluding

---

[1]Cachexia is "[a] general weight loss and wasting occurring in the course of a chronic disease or emotional disturbance." *Cachexia*, Stedman's Medical Dictionary (2014).

that the PAD standards were met and "the involuntary evaluation process should proceed."

¶4 On March 5, 2021, a petition for court-ordered evaluation of G.B. was filed. That same day, the trial court signed an order for evaluation. G.B. was transferred to Banner University Medical Center – South Campus, where psychiatrists Dr. Rohit Madan and Dr. Michael Colon each evaluated her and completed affidavits. Banner[2] subsequently filed a petition for court-ordered treatment, again alleging that G.B. was PAD and requesting combined inpatient and outpatient treatment.

¶5 The trial court held a two-part hearing, during which Claxton, Ojeda, and Madan testified. Consistent with his affidavit, Madan testified G.B. was suffering from "Unspecified Psychosis and likely Delusional Disorder, Somatic type." Madan's and Colon's affidavits, with attached PAD addendums and written reports, were admitted into evidence. G.B. presented testimony from a counselor, an acupuncturist, and a craniosacral therapist,[3] all of whom had treated her in the past. She also called as witnesses Dr. Michael Christiansen, a psychologist, who completed an independent evaluation, and her niece. At the conclusion of the hearing, the court found by clear and convincing evidence that, as a result of a mental disorder, G.B. was PAD and in need of a period of mental health treatment. The court therefore ordered that G.B. receive treatment for "one year with the ability to be re-hospitalized, should the need arise, in an inpatient psychiatric facility for a time period not to exceed 180 days."[4] This appeal followed. We have jurisdiction pursuant to A.R.S. § 36-546.01.

**Discussion**

¶6 Involuntary-treatment proceedings generally begin with a petition for evaluation. *See* A.R.S. § 36-523. An "[e]valuation" is a

---

[2]Banner is represented by the Pima County Attorney in these proceedings. *See* A.R.S. § 36-503.01.

[3]The craniosacral therapist described her work as "therapy that is working with the spine, the sacrum and the brain and the cranial vault," involving decompression of areas that have previously been compressed.

[4]At oral argument in this court, counsel represented that G.B. remains hospitalized and is receiving involuntary injections of antipsychotic medication.

"professional multidisciplinary analysis that may include firsthand observations or remote observations by interactive audiovisual media and that is based on data describing the person's identity, biography and medical, psychological and social conditions," and it can be completed by "[t]wo licensed physicians . . . who shall examine and report their findings independently." A.R.S. § 36-501(12)(a). If, based on that evaluation, it is believed that, as a result of a mental disorder, the patient is PAD, generally, a petition for court-ordered treatment shall be prepared, signed, and filed. A.R.S. § 36-531(B). Section 36-533(B), A.R.S., provides as follows:

> The petition **shall be accompanied** by the affidavits of the two physicians who participated in the evaluation and by the affidavit of the applicant for the evaluation, if any. The **affidavits** of the physicians **shall describe in detail** the behavior that indicates that the person . . . has a persistent or acute disability . . . and shall be based on the physician's observations of the patient and the physician's study of information about the patient. **A summary of the facts that support the allegations of the petition shall be included.** The affidavit **shall also include** any of the results of the physical examination of the patient if relevant to the patient's psychiatric condition.

(Emphasis added.)

¶7 On appeal, G.B. maintains that the order for involuntary treatment should be vacated based on the physicians' failure to strictly comply with the procedures in § 36-533(B). Specifically, she contends that "results of [her] physical examination . . . were not included in the physicians' affidavits." In addition, she maintains "the physicians failed to study pertinent information about [her]."

¶8 We review questions of statutory interpretation de novo. *In re Maricopa Cnty. Mental Health No. MH 2006-000749*, 214 Ariz. 318, ¶ 13 (App. 2007). And, when interpreting a statute, our primary purpose is to give effect to the intent of the legislature. *In re Maricopa Cnty. Superior Court No. MH 2001-001139*, 203 Ariz. 351, ¶ 12 (App. 2002). The "best evidence of that intent" is the statute's plain language. *Id.* When the "language is clear and unambiguous, we apply it without resorting to other methods of

4

statutory interpretation." *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268 (1994); *see also In re Coconino Cnty. Mental Health No. MH 95-0074*, 186 Ariz. 138, 139 (App. 1996) ("When the legislature has spoken with such explicit direction, our duty is clear.").

¶9 Arizona has long recognized that the liberty interests at stake in involuntary-treatment proceedings compel strict statutory compliance. *See In re Commitment of Alleged Mentally Disordered Pers.*, 181 Ariz. 290, 293 (1995) ("Because such proceedings may result in a serious deprivation of liberty . . . the statutory requirements must be strictly adhered to."); *In re Burchett*, 23 Ariz. App. 11, 13 (1975) (commitment proceedings "void" if "[p]roceedings to adjudicate a person mentally incompetent [not] conducted in strict compliance with statutory requirements"); *Maricopa Cnty. No. MH 2001-001139*, 203 Ariz. 351, ¶ 8 (requiring strict compliance); *cf. Riggins v. Nevada*, 504 U.S. 127, 134 (1992) (Forced medication "represents a substantial interference with [a] person's liberty." (quoting *Washington v. Harper*, 494 U.S. 210, 229 (1990) (recognizing potentially severe, debilitating, and even fatal side effects of antipsychotic medication))); *Large v. Superior Court*, 148 Ariz. 229, 236 (1986) ("To the extent that medication is administered forcibly for the purpose of controlling behavior, it is a bodily restraint insubstantially different from the shackles of old.").[5]

¶10 Our supreme court's decision in *Commitment of Alleged Mentally Disordered Person* well illustrates the requirement of strict statutory compliance. There, the court addressed the statutory requirement that the evidence at an involuntary-treatment hearing include "testimony of two or more witnesses acquainted with the patient at the time of the alleged mental disorder . . . and testimony of the two physicians who participated in the evaluation of the patient." A.R.S. § 36-539(B); *see Commitment*, 181 Ariz. at 292. "Four mental health professionals . . . attempted to examine and evaluate [the patient]." *Commitment*, 181 Ariz. at 291. One doctor interviewed him for approximately thirty minutes, and the patient refused

---

[5]Banner and the dissent point out that G.B. did not raise the issue of non-complying affidavits below, and that we generally do not consider arguments made for the first time on appeal. *See In re Maricopa Cnty. Mental Health No. MH 2009-002120*, 225 Ariz. 284, ¶ 7 (App. 2010). Nevertheless, we may review a waived argument in our discretion, *see Nold v. Nold*, 232 Ariz. 270, ¶ 10 (App. 2013), and, in light of the liberty interests implicated by forced administration of anti-psychotic medication, as well as the long-established requirement of strict statutory compliance, we do so here.

to speak with the others. *Id.* The interviewing doctor and two others concluded the patient suffered from "a major mental disorder." *Id.* The interviewing doctor and one other testified as experts at the subsequent involuntary-treatment hearing. *Id.* The other two doctors "submitted written reports as acquaintance witnesses." *Id.* The trial court found the patient was "likely suffering from schizophrenia" and "ordered involuntary commitment and treatment for up to 180 days." *Id.* at 292.

¶11 Our supreme court reversed, concluding "[t]here is a clear distinction between the two categories—acquaintance witnesses and mental health evaluators—and the statute plainly requires both." *Id.* at 292, 293. The court held that "no person whose primary contact with the patient was to examine the patient during his or her commitment evaluation process may testify at the hearing as one of the required acquaintance witnesses." *Id.* at 292; *see also Burchett*, 23 Ariz. App. at 13 (rejecting argument that statutory requirement satisfied by testimony of two examining physicians because they were acquainted with patient).

¶12 In the case at hand, neither Dr. Madan's nor Dr. Colon's affidavit complied fully with the requirements of § 36-533(B).[6] Both affidavits are almost entirely conclusory in nature, and neither "describe[s] in detail the behavior that indicates [G.B.] . . . has a persistent or acute disability" or includes "[a] summary of the facts that support the allegations of the petition," as required by the statute. *Id.* Indeed, portions of the physicians' affidavits are very similar and appear to be standardized text. Such boilerplate language cannot satisfy the requirements of § 36-533(B) insofar as it lacks any personalized discussion of G.B. and details relevant to the physicians' conclusions that she is PAD as a result of a mental disorder. The addenda attached to both affidavits are similarly conclusory and standardized, consisting only of pre-printed forms containing questions related to PAD status with spaces for answers. And, although we assume without deciding that the addenda are part of the physicians'

---

[6]During oral argument before this court, Banner indicated it needed us to apply the doctrine of waiver in order for the physicians' affidavits to survive strict application of § 36-533(B). However, we do not rely on this apparent admission of non-compliance in reaching our disposition. Notably, Banner subsequently argued that based on the evidence provided by both physicians "as a whole," their affidavits complied with the statutory requirements.

affidavits, we do not assume the same regarding the physicians' written reports attached to their affidavits.

¶13        Both Dr. Madan and Dr. Colon attached to their affidavits written reports containing detailed descriptions of the behavior indicating G.B. is PAD.  The plain language of § 36-533(B), however, requires the petition to be "accompanied" by affidavits that "describe in detail" the alleged PAD behavior and "include" a summary of the requisite factual basis and relevant examination results.  In the context of § 36-533(B), therefore, "accompanied" and "include" are not synonymous, and we must conclude that had the legislature intended that having reports accompany the affidavit would constitute compliance, it would have used some form of "accompany" instead of "include."  *See State v. Harm*, 236 Ariz. 402, ¶ 19 (App. 2015) ("[W]hen the legislature chooses different words within a statutory scheme, we presume those distinctions are meaningful and evidence an intent to give a different meaning and consequence to the alternate language."); *Welch-Doden v. Roberts*, 202 Ariz. 201, ¶ 22 (App. 2002) ("If possible, each word or phrase [of a statute] must be given meaning so that no part is rendered void, superfluous, contradictory or insignificant.").  Thus, merely having the written reports accompany the affidavits did not satisfy the statute's plainly stated requirements of inclusion.  Significantly, the written reports, although signed, are not notarized or otherwise signed under penalty of perjury, and are therefore not the equivalent of the affidavits required under the statute.  *See* Ariz. R. Civ. P. 80(c) (permitting a written declaration made under penalty of perjury to be sufficient under any civil rule requiring a verification or affidavit).

¶14        As to Banner's argument that the physicians' written reports were referenced in their affidavits and therefore "supplemented and cured" any deficiencies in the affidavits, we disagree.  Nothing in the affidavits or addenda expressly incorporates by reference the physicians' written reports.  Dr. Madan's affidavit merely states that "[b]ased upon the foregoing evaluation and assessment, the patient has been diagnosed with [u]nspecified psychosis."  But the affidavit does not contain any "foregoing evaluation and assessment," only conclusory statements.  Similarly, the only statement in Dr. Colon's affidavit that could be construed as referring to his written report reads:  "Based upon evaluation and assessment, the patient has been determined to have a severe mental disorder . . . ."  Thus, because we conclude this language is insufficient to incorporate the written reports into the physicians' sworn affidavits, we do not consider their contents in determining whether the petition for court-ordered treatment strictly complied with § 36-533(B).

**¶15**        Moreover, although Dr. Madan testified in detail at the hearing on the petition about his reasons for concluding G.B. was suffering from a mental rather than physical illness, and such testimony may have been sufficient to cure his deficient affidavit, *see In re Maricopa Cnty. Mental Health No. MH 2007-001236*, 220 Ariz. 160, ¶ 20 (App. 2008), Dr. Colon did not testify and therefore the deficiencies in his affidavit could not have been similarly cured.[7]  Thus, even assuming Dr. Madan's testimony cured the deficiencies in his affidavit, his "sole affidavit is not enough to meet the statutory burden."  *Id.*  ¶ 32; *see* § 36-533(B) (requiring petition for court-ordered treatment to be accompanied by affidavits of two physicians).  Because Arizona law requires strict compliance with statutory requirements in involuntary-treatment proceedings, the trial court's order for involuntary treatment of G.B. must be vacated.  *See Maricopa Cnty. No. MH 2001-001139*, 203 Ariz. 351, ¶ 8; *Burchett*, 23 Ariz. App. at 13.

**Conclusion**

**¶16**        For the foregoing reasons, we vacate the trial court's order for involuntary treatment.

E S P I N O S A, Presiding Judge, dissenting:

**¶17**        I respectfully dissent because this is a case where our appellate role as an intermediate court of error-correction should result in a straightforward affirmance of the trial court's judgment, given our standard of review and relevant precedent.  While I agree with my colleagues that involuntary treatment raises substantial liberty interests

---

[7]Among other things, the dissent focuses on the sufficiency of the evidence supporting the trial court's finding of PAD.  Notably, however, Dr. Christiansen, whom G.B. called as a witness, testified that he met with her for approximately eighty minutes, she was able to answer his questions in a logical manner, and did not present with delusional beliefs.  He testified:  "The clinical concern I have is that I did not think she was delusional."  Further, Dr. Christiansen testified concerning the Food and Drug Administration's "black box warning" regarding an "increased risk of death" arising from administering anti-psychotic medication to persons whose symptoms begin after the age of fifty.  He also opined that G.B. was able to make a knowing and intelligent decision concerning her own treatment.  Thus, while we do not reweigh the evidence, it is nonetheless noteworthy that the record is not as one-sided as the dissent would seem to suggest.

warranting strict statutory compliance, *see, e.g.*, *Commitment of Alleged Mentally Disordered Pers.*, 181 Ariz. at 293, this is not a case where those interests were not fully honored and the statute not adequately complied with. The record demonstrates that the court followed the law and fully justifies its decision to respect the uncontradicted medical evidence of G.B.'s disability and worsening condition and adopt the doctors' recommendations, even against her wishes.

**¶18** Preliminarily, it is significant that G.B. never challenged or even mentioned the sufficiency of the physicians' affidavits below, resulting in that issue being waived on appeal. This court generally does not consider arguments, even constitutional ones, asserted for the first time on appeal. *In re Maricopa Cnty. Mental Health No. MH 2009-002120*, 225 Ariz. 284, ¶ 7 (App. 2010); *see also In re Maricopa Cnty. Mental Health No. MH 2008-002659*, 224 Ariz. 25, ¶ 10 (App. 2010) ("[T]he mere invocation of a liberty interest . . . is not necessarily a sufficient reason to forego application of the waiver rule."). The purpose of the waiver rule is to afford the trial court and the opposing party "the opportunity to correct any asserted defects." *Trantor v. Fredrikson*, 179 Ariz. 299, 300 (1994). The rule "protects the party against whom the new argument is asserted from surprise." *Maricopa Cnty. No. MH 2008-002659*, 224 Ariz. 25, ¶ 9; *see also Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, ¶ 21 (App. 2007) (party may not sit back and not call trial court's attention to critical issue, and then urge on appeal that critical issue as grounds for reversal).

**¶19** As Banner pointed out both in its brief and at oral argument before this court, any purported defects in the physicians' affidavits could have been easily cured, before, during, or immediately after the hearing, had G.B. merely raised the issue below. *See Maricopa Cnty. No. MH 2008-002659*, 224 Ariz. 25, ¶ 9; *cf. State v. Henderson*, 210 Ariz. 561, ¶ 19 (2005) (disapproving "defendant from 'tak[ing] his chances on a favorable verdict, reserving the 'hole card' of a later appeal on [a] matter that was curable at trial, and then seek[ing] appellate reversal" (alterations in *Henderson*) (quoting *State v. Valdez*, 160 Ariz. 9, 13-14 (1989))). Because G.B. failed to in any way question the sufficiency of the physicians' affidavits before the trial court, she has waived the right to present that argument at this late stage of the proceeding. *See Maricopa Cnty. No. MH 2009-002120*, 225 Ariz. 284, ¶ 7 (listing several mental-health cases where this court determined appellant had waived arguments not raised below).

**¶20** Moreover, not only did G.B. fail to give the trial court and opposing counsel the opportunity to address and correct any alleged

deficiencies in the statutory process, she invited the error to the extent she stipulated to the admission of Dr. Colon's affidavit, with the attached PAD addendum and written report, into evidence. *See id.* ¶ 8 ("By the rule of invited error, one who deliberately leads the court to take certain action may not upon appeal assign that action as error." (quoting *Schlecht v. Schiel*, 76 Ariz. 214, 220 (1953))). Thus, the argument that Colon failed to comply with § 36-533(B) should not now be entertained. *See id.* Even assuming, however, that G.B. had preserved this issue for appeal and had not invited the error, reversal on this ground is not warranted.

**¶21** On the merits of the issue determined by the majority to necessitate reversal, § 36-533(B) plainly requires the physicians' affidavit to include any "results of the physical examination of the patient *if relevant* to the patient's psychiatric condition." (Emphasis added.) G.B. points to no results that she believes should have been included in the affidavits in this case, and this court is not in a position to determine what results would have been "relevant" to the physicians. More importantly, however, we need not focus on the affidavits in a vacuum because it is well-established that "supplementation may cure a defective affidavit." *Maricopa Cnty. No. MH 2007-001236*, 220 Ariz. 160, ¶ 20; *see also In re Maricopa Cnty. Mental Health No. MH 2011-000914*, 229 Ariz. 312, ¶ 14 (App. 2012). The majority's reliance on *Commitment of Alleged Mentally Disordered Pers.*, 181 Ariz. 290, is misplaced in that not only is that case readily distinguishable from the one at hand, it does not address appropriate supplementation of the required affidavits. In keeping with relevant precedent, to the extent Dr. Madan's affidavit could be construed as insufficient, any defects were cured by his detailed testimony at the hearing regarding his physical examination, evaluation, and diagnosis of G.B. *See Maricopa Cnty. No. MH 2011-000914*, 229 Ariz. 312, ¶ 14 (testimony at hearing may cure deficient affidavit).

**¶22** And to the extent that Dr. Colon's affidavit could be construed as insufficient, as noted above, G.B. stipulated to the admission of Colon's PAD addendum and written report, which similarly supplemented his affidavit with details of his physical examination, results from the lab reports, and evaluation of G.B. *See State v. Allen*, 223 Ariz. 125, ¶ 11 (2009) (stipulations bind parties and relieve them of burden of establishing stipulated facts). In particular, given the underlying purpose of the statutory requirements that there be competent evidence of individualized assessments based on detailed professional examinations, data, and conclusions, *see In re Maricopa Cnty. Mental Health No. MH 2008-*

*000438*, 220 Ariz. 277, ¶ 16 (App. 2009), G.B. has not established that the physicians failed to comply with § 36-533(B).[8]

**¶23** At bottom, G.B. mainly challenges the sufficiency of the evidence to support the trial court's finding that, as a result of a mental disorder, she is persistently and acutely disabled.[9] *See* A.R.S. §§ 36-501(32) (defining persistent or acute disability), 36-540(A) (options for court-ordered treatment). But if there is reasonable evidence supporting the court's judgment, we will not second-guess its determination. *See In re Pima Cnty. Mental Health No. MH-2010-0047*, 228 Ariz. 94, ¶ 17 (App. 2011); *see also In re Maricopa Cnty. Mental Health No. MH2014-002674*, 238 Ariz. 188, ¶ 9 (App. 2015). Such evidence is abundant here.[10]

---

[8]The majority also finds insufficient statutory compliance in that the doctors' reports were not notarized or "expressly incorporate[d] by reference" into their affidavits. But it is hardly surprising that the doctors did not contemplate utilizing the legalistic technique of incorporation by reference, not to mention notarization, when their professional reports were directly attached and clearly intended to augment their affidavits. *See In re Pima Cnty. Mental Health Serv. Action No. MH-1140-6-93*, 176 Ariz. 565, 567-68 (App. 1993) (although involuntary-commitment statutes must be strictly construed, we will not do so if result is contrary to legislative intent); *cf. Sklar v. Town of Fountain Hills*, 220 Ariz. 449, ¶ 11 (App. 2008) (although strict construction applies, we broadly construe requirements in determining if compliance was achieved).

[9]As noted in Banner's answering brief on appeal, although G.B. first raised the issue of statutory compliance in her opening brief, she provided little in the way of any statutory analysis, focusing instead on evidence and arguments she contends the trial court should have adopted, and she did not file a reply brief. Indeed, at no point did she make the argument espoused by the majority—that when determining whether the physicians' affidavits comply with § 36-533(B), we cannot consider the written reports attached thereto and referenced therein.

[10]The majority suggests I have related the evidence in a "one-sided" manner. But any such weighing of the record is not only appropriate, but legally mandated by our standard of review. *See Maricopa Cnty. No. MH 2008-001188*, 221 Ariz. 177, ¶ 14 (evidence viewed in light most favorable to sustaining trial court's judgment).

¶24    At the outset, the record contains a prior court-ordered evaluation for G.B. in June 2020, based on similar circumstances, wherein she was medically diagnosed with "major depression with psychosis." Approximately ten months later, immediately before the current petition was filed, G.B. was independently diagnosed with a delusional disorder at St. Mary's Hospital. As part of the current petition, Dr. Madan stated in his affidavit and testified at the hearing that G.B. was suffering from "severe mental illness," which he diagnosed as "Unspecified Psychosis and likely Delusional Disorder, Somatic type." He explained that the condition was treatable but G.B. was unwilling to participate in the recommended treatment because she "doesn't think there are any psychiatric symptoms." This is consistent with Claxton's testimony discussing G.B.'s February 2021 transfer from TMC and her refusal to take the medications prescribed for her treatment at St. Mary's. Madan further observed that G.B.'s mental illness was "substantially impair[ing her] ability to make an informed decision regarding [her] mental health treatment," and he described a cycle whereby she "keeps going back to the hospital because she knows she's losing weight and she needs help but the very help they recommend she isn't able to follow." He explained that her malnourishment posed serious risks of organ and heart failure and that "as time passes [her] symptoms are likely to get worse." He thus concluded G.B. should "remain in an inpatient setting for further observation, stabilization and evaluation," and her treatment plan could include antidepressants and antipsychotics, as well as work with a dietician.

¶25    Dr. Colon similarly concluded that G.B. was suffering from "a severe mental disorder, with specific diagnoses of Unspecified Psychosis and Delusional Disorder," and that her "mental illness substantially impairs her insight, judgment, reason, behavior or perception of reality." He stated she was unable to appreciate the benefits of medication, was "hyper focuse[d]" on the risks, and without treatment she would "likely . . . suffer severe emotional, mental or physical harm." He also explained that G.B.'s condition was treatable and recommended continued inpatient treatment.

¶26    Finally, G.B.'s own outpatient psychiatrist independently expressed opinions similar to those of Drs. Madan and Colon. He reported that he "does not think he can help [G.B.]" because she "refuses to accept any other explanation" for her physical symptoms "other than what she

thinks."[11]  He stated that G.B. needs "to be directed to do treatment[,] otherwise left to herself she will just keep doing what she's been doing and it was not helping."  G.B.'s niece also expressed concern for her aunt, at one point stating there may be "something that is in her head which could lead to physical manifestations."

¶27        In sum, while the severe infringement on an individual's liberty and personal autonomy imposed by forced medication cannot be discounted, here, based on the physicians' affidavits, addenda, reports, and testimony presented at the hearing, there is ample, if not overwhelming, evidence that complies with the purpose, intent, and requirements of § 36-533(B), and supports the trial court's finding that, as a result of a mental disorder, G.B. is persistently or acutely disabled.  I therefore would affirm the trial court's order for involuntary treatment.

---

[11]G.B. at various times complained of a tapeworm infestation, heavy metal poisoning, and an infection from an abscessed tooth, all disproved through standard diagnostic procedures and blood tests.  Although the majority cites testimony by a psychologist who "met with [G.B.] for approximately eighty minutes" and found her non-delusional, the trial court was well within its discretion to reject that opinion and credit the contrary diagnosis of her established medical psychiatrist.  *See Pima Cnty. No. MH-2010-0047*, 228 Ariz. 94, ¶ 7 (we defer to trial court's assessment of witness credibility and weighing relative strength of testimony).