UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael Francis CHARTERS, Jr.,
Defendant-Appellant.

No. 86–5568.

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1987.

Decided Sept. 18, 1987.

Thomas Rawles Jones, Jr. (William B. Moffitt, Lisa Bondareff Kemler, Moffitt & Jones, Alexandria, Va., on brief), for defendant-appellant.

Constance H. Frogale, Asst. U.S. Atty. (Henry E. Hudson, U.S. Atty., Alexandria, Va., Melissa Glassman, Third-Year Law Student, on brief), for plaintiff-appellee.

Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

MURNAGHAN, Circuit Judge:

Michael Francis Charters appeals a district court order permitting medical personnel at the Federal Correctional Institution at Butner, North Carolina (Butner) to medicate him with antipsychotic drugs over his objection.

Charters was indicted in late 1983 for making threats against the President of the United States in violation of 18 U.S.C. § 871. On February 1, 1984, the district court found Charters incompetent to stand trial and ordered him confined to Butner pursuant to what was then 18 U.S.C. §§ 4241–4247. Thereafter, the district court reviewed Charters' commitment to Butner five times,[1] each time finding Charters dangerous and incompetent to stand trial and returning him to Butner.

Upon the government's motion, in May 1986, the district court entered an order permitting medical personnel at Butner forcibly to medicate Charters with antipsychotic drugs but stayed the order pending Charters' expedited appeal to the Fourth Circuit. The district court decided to permit forcible medication after weighing Charters' interests in liberty and privacy against the interests of the government. The court identified three government interests: (1) protecting society and other inmates from a dangerous individual; (2) ensuring the defendant's competence to stand trial; and (3) providing proper care

---

1. On June 5, 1984, the district court found that Charters continued to be incompetent to stand trial and that he was a "present public danger," and recommitted him to Butner. At the same time, the court denied a government request to medicate Charters forcibly.

On December 11, 1984, March 22, 1985, July 11, 1985 and October 11, 1985 the district court made essentially the same findings and recommitted Charters.

and treatment for its citizens. The court identified Charters' interests as liberty and privacy protected by the Due Process Clause of the Fifth Amendment and freedom of thought protected by the First Amendment.

Based on the testimony of a single witness, Dr. Sally Johnson, a psychiatrist employed as director of Forensic Services and Clinical Research at Butner, the court concluded that the government's interests outweighed the individual's interests, and ordered the forcible medication. The principal basis for the court's ruling was its

conclusion that the state's "duty" to treat the medical needs of pretrial detainees justified forcibly medicating Charters.[2]

In finding that Charters should be forcibly medicated, the district court also concluded that Charters was not competent to make decisions concerning his medical care. The court equated competence to stand trial (legal competence) with competence to make personal health care decisions (medical competence):

The inability to understand the nature and consequences of the proceedings

2. Despite the substantial and potentially quite adverse side effects of antipsychotic drugs, Johnson testified that Charters would be better off receiving the medication. Johnson minimized the seriousness and likelihood of the side effects, saying that they could be avoided by properly adjusting the medication. Others writing on the subject of antipsychotic medication have not been so complacent about the severity and probability of adverse side effects.

The most serious threat antipsychotic drugs pose to a patient's health is tardive dyskinesia. Tardive dyskinesia is characterized by rhythmic and involuntary muscle movements. These movements often occur in the oral region and the associated uncontrollable movements of the lips and tongue may be grotesque and socially objectionable. Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 N.W.U.L.Rev. 461, 476 (1977). The convulsive muscle movements caused by tardive dyskinesia may also affect the limbs and trunk and may be so severe that they are crippling. G. Burrows, T. Norman & B. Davies, *Drugs in Psychiatry: Antipsychotics* 186 (1985) (tardive dyskinesia can cause significant disability, "sometimes interfering with speech, eating, dexterity and respiration.")

There is no known effective treatment for tardive dyskinesia. *Drugs in Psychiatry, supra*, at 186, 199, 205. Note, *A Common Law Remedy for Forcible Medication of the Institutionalized Mentally Ill*, 82 Colum.L.Rev. 1720, 1726 (1982). *See Rennie v. Klein*, 720 F.2d 266, 276 (3d Cir. 1983) (Weis, J., concurring).

Nor is there a reliable method of preventing tardive dyskinesia other than avoiding treatment with antipsychotic drugs. Patients who are vulnerable to the disorder can develop symptoms after a relatively brief period of treatment and upon low dosages of antipsychotic medications. *Drugs in Psychiatry, supra*, at 190. The evidence is inconclusive as to whether the disorder can be avoided by stopping treatment at intervals. *Drugs in Psychiatry, supra*, at 192. Tardive dyskinesia sometimes does not appear until late in the course of treatment or even until after treatment has been discontinued entirely. Plotkin, *Limiting the Therapeutic Orgy*,

*supra*, at 476. Thus, contrary to Dr. Johnson's assurances, the disorder seemingly does not give warnings of its onset in time to enable physicians to discontinue or modify treatment before the patient is permanently disabled.

Tardive dyskinesia is not a rarity. Estimates of its incidence among long term antipsychotic drug users vary from one-half of one percent to over 50 percent with an average reported prevalence of 15 to 20 percent in institutionalized patients. *Drugs in Psychiatry, supra*, at 188; J. Kane & J. Smith, *Tardive Dyskinesia: Prevalence and Risk Factors, 1959–1979*, 39 Arch. Gen. Psychiatry 473 (1982). *See* Note, *A Common Law Remedy, supra*, at 1726. *Bee v. Greaves*, 744 F.2d 1387, 1390 n. 3 (10th Cir. 1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). More recent studies show that the prevalence of tardive dyskinesia is increasing. *Drugs in Psychiatry, supra*, at 188.

Antipsychotic drugs also affect the thought process, bringing about disorders called akinesia and akathisia. Akinesia causes the individual to feel enervated and to complain of being "dead inside." Akathisia is a state of restlessness, agitation or even panic. Fentiman, *Whose Right is it Anyway?: Rethinking Competency to Stand Trial in Light of the Synthetically Sane Insanity Defendant*, 40 U. Miami L.Rev. 1109, 1128 (1986). Antipsychotics reduce the individual's ability to remember, reason, or function effectively in any complex learning situation. Fentiman, *supra*, at 1132–33.

Antipsychotic drugs commonly cause temporary physical side effects. These include muscle spasms of the eyes, neck, face and arms, irregular writhing or grimacing movements, and protrusion of the tongue. The drugs may produce symptoms similar to those displayed by sufferers of Parkinson's disease: mask-like face, drooling, muscle stiffness and rigidity, shuffling gait, and tremors. Plotkin, *Limiting the Therapeutic Orgy, supra*, at 475. Non-muscular side effects include drowsiness, weakness, dry mouth, swollen tongue, and blurred vision. *Id.* at 474–76. Rhoden, *The Right to Refuse Psychotropic Drugs*, 15 Harv.C.R.C.L.L.Rev. 363, 378–82 (1980).

against him and to assist properly in his defense, the elements of incompetence to stand trial, equate with the reasoning, decision making, and comprehension inabilities prompting the defendant's refusal to accept medication. And the court's findings as to the former are applicable to the latter.

The court based its conclusion that Charters was not competent to make decisions concerning his medical treatment on Dr. Johnson's testimony. Dr. Johnson took the position that Charters' medical incompetence was evidenced by his refusal to accept antipsychotic medication since refusing the medication was not, in Johnson's view, the decision most beneficial to Charters. The government later summarized Johnson's testimony as follows:

So, the drugs have been discussed with him. The positive effects, the risks. [H]e does have a primal level of understanding about the nature of the drugs and what it does to him. [H]is response, it is not an incompetent response from the perspective of making a rational, reasoned decision where he responds appropriately and not in non sequiturs, but is incompetent from somebody who is trying to do him good. And he needs to be helped....

## DISCUSSION

### I. *Introduction*

Before reaching the central question on appeal—under what, if any, conditions a patient in a federal treatment facility may be forcibly and unwillingly medicated with antipsychotic drugs—we first address a preliminary issue: Charters' federal custodians do not at present have legal authority to detain Charters because procedures mandated by federal statutes governing detention of the mentally ill in federal facilities have not been followed. Although Charters did not raise the legality of his detention in a petition for *habeas corpus,* the issue is presented by the underlying dispute: If the federal government has no authority even to detain a man, it surely cannot forcibly inject him with chemicals which may well be dangerous and mind

altering short of an emergency requiring such intrusion. No such emergency presented itself in the case before us. We therefore remand and direct the district court to conduct an inquiry into the legality of Charters' detention.

We then turn to the question of forcible medication. We conclude that a mentally ill pretrial detainee has a constitutionally protected interest in deciding for himself whether to accept or forego medical treatment. Where the detainee is competent to consent to or refuse medical care, his constitutional interest in making such decisions outweighs the government's interest in medicating him against his will. Furthermore, a patient is entitled to be presumed competent until adjudicated incompetent.

Regarding a patient who is found incompetent to direct his own medical care, we conclude that incompetence does not extinguish a patient's constitutional rights and examine the alternatives available to allow treatment decisions to be made on that patient's behalf. We hold that the custodians of such a patient must apply for a court order permitting forcible medication. Upon such application, if it can be ascertained by the district court what treatment the patient would, if competent, select for himself then that "substituted judgment" is dispositive. Otherwise, the district court should direct treatment in accordance with the patient's best interests. Finally, because the present case does not present an emergency situation in which violence or the imminent deterioration of a patient will occur in the absence of forcible medication, we do not resolve whether such a situation might call for a different result.

### II. *Charters is Not Properly in Federal Custody*

In continuing Charters' detention for more than three years, the district court attempted to comply with federal statutes governing the detention of mentally ill persons who are accused of federal crimes, 18 U.S.C. §§ 4241–4247. Charters was originally committed to Butner under an earlier version of the current law. In 1984, Con-

gress significantly amended the procedures governing confinement of mentally ill persons. The district court apparently was unaware that, under the revised statutes, procedures once adequate are no longer sufficient.

■ Charters did not directly raise the question of the legality of his detention in proceedings below, and we do not treat his claim as one for *habeas corpus* because that issue has not properly been presented. We do address the legality of Charters' detention as it relates to Charters' right to resist forcible medication at the hands of federal medical personnel. Before it can be determined that the government has authority to medicate Charters forcibly, it must be established that it has legitimate authority over his person at all. Because Charters is not properly detained under any federal law and no emergency otherwise justifies governmental intrusion, we cannot sanction forcible medication: to do so might well compound the denial of due process that Charters has already experienced.

Two statutory sections contained in the new law are relevant to Charters' confinement. The first, 18 U.S.C. § 4241(d), provides for the temporary custody of a defendant judged incompetent to stand trial. The section permits federal custody and treatment of the individual for four months, a period of time, here long since expired, which Congress deemed adequate to determine the probability that the individual would regain competence in the fore-

seeable future. The four month limit under 18 U.S.C. § 4241(d)(1) may be extended for an "additional reasonable period" of time if the court makes an explicit finding that there is a "substantial probability" that the defendant will attain the capacity to permit the trial to proceed within the additional time. 18 U.S.C. § 4241(d)(2).[3]

A second section, 18 U.S.C. § 4246(a), provides for the custody of mentally ill individuals who no longer realistically can be considered to be awaiting trial because there is little possibility of their regaining competency.[4] However, federal custody is permitted under § 4246(a) only after efforts have been made to obtain placement in a state institution for the individual and the efforts have not succeeded.

■ Charters' confinement is not in compliance with the provisions of § 4241. Charters has been in a federal treatment facility since February 1984, more than three years, while § 4241(d)(1) normally cuts off custody after four months. There has been no finding by the court pursuant to § 4241(d)(2) that there is a substantial probability that Charters will attain a level of competency within an additional reasonable time so as to permit the trial to proceed. Indeed, the *opposite* finding has in effect been made. The district court found that Charters "shows no promise of improvement under the current treatment." Even were Charters medicated against his wishes, the court found "[t]here is no way of knowing ... whether [Charters] would

---

**3.** 18 U.S.C. § 4241(d) provides as follows:
 If [after a competency hearing], the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility—
 (1) for such a reasonable period of time, *not to exceed four months,* as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed; and

 (2) for an *additional reasonable period of time* until—
 (A) his mental condition is so improved that trial may proceed, *if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the trial to proceed;* or
 (B) the pending charges against him are disposed of according to law;
 *whichever is earlier.*
 18 U.S.C. § 4241(d) (emphasis added).

**4.** The section also provides for the detention of other individuals who are no longer awaiting trial (for example because they have already served their sentences). The provisions are not relevant here.

be likely to improve under drug treatment to the point where he would be competent to stand trial." [5] Thus, Charters is apparently not properly in custody under either prong of section 4241.[6]

■ After the expiration of the time limit set by section 4241, Congress provided that federal custody can only be continued if efforts are first made to find a state treatment facility for the individual. Congress has stated that it "is essentially the function of the States" to provide care and treatment for the mentally ill. S.Rep. No. 225, 98th Cong., 2d Sess. 250, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3432. A mentally ill individual is to be retained in federal custody beyond the time limits established by section 4241 "only in those rare circumstances where [he] has no permanent residence or there are no State authorities willing to accept him for commitment." *Id.*[7]

So that its goals are realized, Congress designed procedures to ensure that every attempt is made to find a state alternative to federal care of the mentally ill.[8] It is only upon compliance with the procedures, under § 4246, that federal detention can be continued after the time allotted by section 4241 has expired: The head of the confining institution must certify to the clerk of the court that the individual is mentally ill and dangerous and *that no state placement is available for the individual.*[9] Upon that certification, the district court must hold a hearing to evaluate whether

5. These findings by themselves are enough to render Charters' detention under section 4241 illegal since Congress has made clear that, if, at any time during detention under section 4241(d), it is determined that the defendant's mental condition will not ever improve so as to permit the trial to proceed, the defendant can no longer be held under that section. S.Rep. No. 225, 98th Cong. 2d Sess. 236, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3418.

6. *United States v. Baker,* 807 F.2d 1315, 1320 (6th Cir.1986) ("We believe that [section 4241] requires that a determination as to the individual's mental condition be made within four months, and that the individual cannot be held pursuant to section 4241 in excess of four months unless the court finds that the individual is likely to attain competency within a reasonable time.").

7. Congress' unwavering position that care of the mentally ill is not a federal function is also evidenced in section 4246(g), which provides that once federal charges have been dismissed the federal government must release *even a dangerous defendant* if he cannot be given to state custody. 18 U.S.C. § 4246(g). *See also* S.Rep. No. 255, 98th Cong. 2d Sess. 253, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3435; *United States v. Baker,* 807 F.2d 1315, 1324 (6th Cir.1986).

8. 18 U.S.C. § 4246 provides that:
If the director of a facility in which a person is hospitalized *certifies* that a person ... who has been committed ... pursuant to section 4241(d) ... is [1] presently suffering from a mental disease or defect [2] as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and [3] that *suitable arrangements for State custody and care of the person are not available,* he

shall transmit the certificate to the clerk of the court for the district in which the person is confined.... The court shall order a hearing to determine whether the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another.
18 U.S.C. § 4246(a) (emphasis added).

9. The duties incumbent upon the facility director to attempt to arrange state placement were detailed by Congress:
Whenever the director of the facility determines that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, *he must determine whether other suitable arrangements for the care and custody of the person are available.* In this context, *it is expected that he will notify the proper authorities in the State* in which the person maintains a residence or in which he was tried to determine if the State will assume responsibility for the defendant. *If the State determines that he should be civilly committed, the director of the facility may transfer him upon expiration of his sentence to the proper State authorities.* In essence, the person is about to be released and because of his condition the State has instituted civil commitment procedures as it would against any other mentally ill citizen. On the other hand, if there is no State to which the person has sufficient ties, then the head of the facility must proceed pursuant to this section.
S.Rep. No. 225, 98th Cong., 2d Sess. 251, *reprinted in* 1984 U.S.Code. & Ad. News 3182, 3433 (emphasis added).

the individual is mentally ill and dangerous. Furthermore, even after the appropriate procedures have been followed, the federal government is under a continuing obligation to make efforts to find a state placement for the patient. 18 U.S.C. § 4246(d).

■ Although the district court has held a series of hearings concerning Charters, the procedures so clearly mandated by section 4246 have not been followed. The record discloses no efforts to obtain state custody for Charters and no certification that suitable arrangements for state custody of Charters are unavailable (the record also indicates that the statute's other certification requirements have not been complied with). For these reasons, Charters is almost certainly not properly in federal custody under section 4246.

In summary, given the plain language and expressed purpose of the statute, the conclusion is virtually inescapable that Charters is being improperly confined. The noncompliance with the statute is not a mere technicality—it is directly contrary to Congress' command. As the legislative history unequivocally states, Congress considered the care and custody of the mentally ill to be a state function and not a task for the federal government. In view of Congress' emphatic statement, the district court should not overlook the fact that the government has completely failed to comply with the terms of the law designed to ensure that a detainee is given to the care of the state at the earliest opportunity.

We remand the matter to the district court for a determination of whether Charters may remain in federal custody under the governing statutes. The district court has already made findings which render § 4241 inapplicable, holding that there is no substantial probability that Charters will regain legal competence, with or without antipsychotic drugs. However, if efforts are made to find state placement for Charters, such efforts are unsuccessful, the proper certification is made, and the court finds after a hearing that Charters is mentally ill and dangerous, or there are other adequate reasons not now apparent to us, custody may be continued under § 4246.

The legality of Charters' detention is a threshold matter. Only after a finding that Charters is legally detained can there be governmental authority to medicate Charters against his will.

■ Although we have concluded that Charters' almost certainly illegal detention at present in the federal facility requires remand for reconsideration of the district court's order permitting forcible medication, that conclusion does not entirely resolve the issues before us. Charters is likely to remain in federal custody for some time—at least until the completion of proceedings on remand, which may entail a time consuming search for an appropriate state placement for Charters—and perhaps longer. Without an order protecting him from forcible medication, to which we perceive him to be entitled, the stay entered by the district court will expire at the conclusion of the present appeal, and Charters will again be at risk of forcible medication. On the other hand, if, to protect Charters, the Court were to order that Charters may not under any circumstances be medicated by federal authorities, we would be tying the hands of the government and perhaps depriving Charters of a treatment alternative which is beneficial and legitimate, without having adjudicated the issue. If we are to avoid either of these two extremes, we cannot defer resolution of the forcible medication issue. By resolving that issue we ensure that neither Charters' interests nor the interests of the government will suffer unnecessarily during the time required to determine his status, and afterwards if Charters remains in federal custody.

III. *Forcible Medication of a Mentally Ill Individual in Federal Custody*

A. *Youngberg v. Romeo*

■ The Supreme Court has never squarely decided what substantive and procedural protections the Constitution affords a mentally ill patient who refuses antipsychotic medication. In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), however, the Court did

consider the legality of restraining a profoundly retarded man in state custody for other than criminal reasons. In the absence of a Supreme Court decision directly on point, we begin our discussion by examining *Romeo* to see whether it dictates a result in the case before us.

*Romeo* concerned a profoundly retarded 33 year-old man who had the mental capacity of an 18 month-old child and an I.Q. of between 8 and 10. Completely unable to talk or care for himself, Romeo had been involuntarily committed to a Pennsylvania state facility by his mother. While at the institution, Romeo was injured, it was alleged, sixty-three times by his own violence and by the reactions of other inmates to him. At one point, Romeo was hospitalized for treatment of a broken arm. During that time, he was restrained with soft arm restraints for periods of each day. The restraints were intended to ensure that Romeo did not further injure himself or cause injury to other patients (some of whom were in traction or being treated intravenously) while in the hospital. 457 U.S. at 310–11, 102 S.Ct. at 2455. Romeo sought damages under 42 U.S.C. § 1983, alleging that he had been injured, that he had been routinely restrained for prolonged periods of time, and that he was not receiving appropriate training.

The Supreme Court approached the questions raised by Romeo's suit by balancing the "liberty of the individual," protected by the Fourteenth Amendment, against "the demands of an organized society." 457 U.S. at 320, 102 S.Ct. at 2460. The Court held that Romeo had interests in personal safety and freedom from bodily restraint.[10] 457 U.S. at 315–16, 102 S.Ct. at 2458. However, after weighing Romeo's interests against the state's interests in managing an institution, the Court ruled that Romeo was entitled only to an assurance that professional judgment had been exercised in deciding what care he would receive:

[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.

457 U.S. at 321, 102 S.Ct. at 2461. The Court also indicated that deference to the judgments of the professionals charged with caring for Romeo was required: "[T]he decision, if made by a professional, is presumptively valid." 457 U.S. at 323, 102 S.Ct. at 2462.

There are important distinctions between *Romeo* and cases involving forcible medication of a mentally ill patient, particularly one charged with a crime, where a threat of violence to himself or others, while arguably present, has not yet, in more than three years, manifested itself. The first distinction is based on competence. Romeo was completely unable to participate in decisions concerning his medical treatment because of the profundity of his handicap. It was a given that Romeo could have *no* input in matters concerning his care, and the questions before the Court were who should make decisions on his behalf and by what standards. The case did not consider the rights of a competent patient to determine the course of his medical treatment. *Bee v. Greaves,* 744 F.2d 1387, 1396 n. 7 (10th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

The balance of individual and governmental interests is quite different where a mentally ill patient such as Charters is concerned. Mentally ill patients, though incapacitated for particular purposes, can be competent to make decisions concerning their medical care[11] and thus treatment decisions involving mentally ill individuals raise difficult questions about the deference which must be accorded a potentially competent patient's desires—questions *Romeo* did not in any way address.

---

**10.** The Court found that Romeo had a constitutional interest in training insofar as training was relevant to enable him to avoid injury and remain free from restraint and did not otherwise resolve the question of entitlement to training. 457 U.S. at 319, 102 S.Ct. at 2460.

**11.** *See Davis v. Hubbard,* 506 F.Supp. 915, 935 (N.D.Oh.1980) ("[T]here is no necessary relationship between mental illness and incompetency which renders [the mentally ill] unable to provide informed consent to medical treatment.").

There are other important differences between the present case and *Romeo*. Regardless of whether Charters is medically competent, a second distinction arises from the degree of harm caused by the medication. The restraints which had been applied to Romeo were temporary and posed no threat of distressing or permanent side effects. Antipsychotic drugs, on the other hand, may well cause serious and irreversible injury in a significant percentage of cases.[12]

A further distinction arises from the fact that, unlike the purely physical restraints considered in *Romeo*, antipsychotic medication has the potential to infringe upon an individual's freedom of thought. We have little doubt that if the medical treatment at issue here was psychosurgery, such as lobotomy, it would be readily apparent that very significant interests concerning freedom of thought were implicated. Although the effects of mind altering antipsychotic medication may not so immediately arouse Orwellian visions, the effects of the drugs at issue here can be comparable. There is, at least, no principled distinction between the chemical invasion of drug therapy and the mechanical invasion of surgery.

Nor would a finding that Charters is medically incompetent diminish his interest in freedom of thought. Charters may be medically incompetent yet remain functional in other aspects of his life. Forcible medication with mind-altering drugs will affect the well functioning aspects of personality as well as the disturbed aspects. The drugs may affect mood and emotion, dull the senses and make reading and concentration difficult. In short, the decision in the present case may profoundly impact an interest at the core of liberty—the protection of the thought processes that define individuality—an interest which was not at issue in *Romeo*.

Finally, deference to medical judgment was more appropriate in *Romeo* than in the present case. In *Romeo*, the Supreme Court considered a circumstance in which the plaintiff had been injured on numerous occasions. In view of Romeo's history, the staff had obvious reasons to believe that, if not restrained, Romeo might further injure himself and even pose a threat to the other patients. In the present case such fears have not so far materialized. In a context where the need to take some action to prevent *further* physical injuries was unmistakable, the Supreme Court held that a court's only role is to ensure that professional judgment has been exercised in deciding what action must be taken. The Court reasoned that the judiciary is not equipped to second guess a professional decision that the best method of preventing a patient from injuring himself or others is physically to restrain him, where there is no threat that permanent incapacity will result.

The present case is significantly different. There is *no* history of injury to Charters or injuries to other patients inflicted by Charters. The threat that the suggested treatment will cause *permanent* injury is substantial. In such a case, the decision whether forcibly to medicate Charters is not exclusively a professional judgment. Although there is certainly a component of medical knowledge required, the decision also involves an evaluation of the personal risks and benefits of undertaking the proposed course of treatment that goes beyond medical expertise. The traditional role of a physician is to advise a patient as to the risks and benefits of a plan of medical treatment, not to dictate that he under-

12. *Bee v. Greaves*, 744 F.2d 1387, 1396, n. 7 (10th Cir.1984) ("Romeo is distinguishable ... because it involved temporary physical restraints rather than mental restraints with potentially long term effects...."); *Rennie v. Klein*, 720 F.2d 266, 276 (3d Cir.1983) (Weis, J., concurring) ("Unlike the temporary and predictable effects of bodily restraints, the permanent side effects of antipsychotic drugs induce conditions that cannot be corrected simply by cessation of the regimen. The permanency of these effects is analogous to that resulting from such radical surgical procedures as a pre-frontal lobotomy."); *Guardianship of Roe*, 383 Mass. 415, 421 N.E.2d 40, 53 (1981) ("Because of both the profound effect that these drugs have on the thought processes of an individual and the well-established likelihood of severe and irreversible adverse side effects ... we treat these drugs in the same manner we would treat psychosurgery or electroconvulsive therapy.").

go that treatment.[13] The choice to undergo treatment is an individualized one which reflects the patient's unique perspective. Physicians have no particular facility with regard to an individual assessment of whether the hazards involved in a particular treatment—as seen by the individual—outweigh its benefits to the individual. Therefore, in the present case, unlike *Romeo*, deference to professional judgment is not the only or even the ordinary way [14] of deciding whether Charters should undergo treatment with antipsychotic medication.[15]

**B. Balancing the Individual's Interests in Resisting Forcible Medication Against the Government's Interests in Administering such Medication**

*1. The Individual's Interests*

■ Because of the important differences between *Romeo* and the present case we cannot mechanically adopt and apply the formula there outlined by the Supreme Court. Instead, to resolve whether, and under what circumstances, Charters may be forcibly medicated with antipsychotic drugs we must balance the particular interests of the individual and the governmental interests implicated by the case before us, just as the Supreme Court balanced the relevant interests before it in *Romeo*.

Forcible medication with antipsychotic drugs implicates individual rights to freedom from physical invasion and freedom of thought as well as the right to privacy protected by the Constitution and the common law.

The right to be free of undesired physical touching traces its origins to the English common law of the middle thirteenth century, F.W. Maitland, *The Forms of Action at Common Law* 40, 43, 53 (1985 ed.), and today is reflected in the tort of battery which protects the individual against even the slightest unconsented touching. W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on The Law of Torts* § 9 p. 39 (5th ed. 1984). The right to be free of unwanted physical contact and its ancient common law origins has been recognized by the Supreme Court:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person,

---

**13.** "[I]t is now a well-established rule of general law, ... binding ... upon the medical profession at large, that it is the patient, not the physician, who ultimately decides if treatment—any treatment—is to be given at all." *Tune v. Walter Reed Army Medical Hospital,* 602 F.Supp. 1452, 1455 (D.D.C.1985).

**14.** *People v. Medina,* 705 P.2d 961, 968 (Colo. 1985) (*en banc*) ("Although the decision to forcibly medicate a patient with antipsychotic drugs undoubtedly involves an aspect of professional medical judgment in connection with psychiatric diagnosis and treatment alternatives, the fact remains that the decision itself directly implicates the patients' legal interests in personal autonomy and bodily integrity."). *See In re Mental Commitment of M.P.,* 500 N.E.2d 216, 225 (Ind.App.1986) (Sullivan, J., dissenting) ("The *Youngberg* proposition that there is 'no reason to think judges or juries are better qualified than appropriate professionals in making [treatment] decisions' may not be reasonably disputed. Conversely, however, I do not believe that there can be any quarrel with the proposition that those professionals are not better qualified than judges or juries in balancing delicate constitutional rights and duties.").

**15.** Of course, *Johnson v. Silvers,* 742 F.2d 823 (4th Cir.1984) indicated that the professional judgment standard should be applied where a medically incompetent person who has been involuntarily civilly committed sues for damages growing from forcible medication. At the same time, *Johnson v. Silvers* established that individuals have a constitutionally protected interest in avoiding unwanted medication with antipsychotic drugs.

However, *Johnson v. Silvers* left unanswered the questions which are presented here because the present case involves a commitment primarily criminal in nature under a statute which reflects little concern for the well-being of the detainee. *Johnson v. Silvers* on the other hand concerned an individual who had been involuntarily civilly committed under a state statute which had as its primary goal the protection and rehabilitation of the mentally ill. Furthermore, the requirements for involuntary commitment under the statute in *Johnson v. Silvers* amounted to a finding of medical incompetence, whereas any finding of incompetence with respect to Charters is restricted to incompetence to stand trial. The differences between the two statutes are sufficient to remove the *Charters* case from the purview of *Johnson v. Silvers*.

free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Railway Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1890).[16]

The right to avoid unwanted touching of one's person forms the basis of the doctrine of informed consent. The doctrine of informed consent provides that a patient has a right to be informed of the value and possible consequences of a treatment and to refuse or consent to that treatment.[17]

The right to be free of unwanted physical invasions has been recognized as an integral part of the individual's constitutional freedoms, whether termed a liberty interest protected by the Due Process Clause, or an aspect of the right to privacy contained in the notions of personal freedom which underwrote the Bill of Rights.[18] The right to refuse medical treatment has been specifically recognized as a subject of constitutional protection.[19]

---

**16.** *Bee v. Greaves,* 744 F.2d at 1392 (the law of torts has long recognized a person's interest in making decisions about his body); *Davis v. Hubbard,* 506 F.Supp. 915, 930 (N.D.Oh.1980) ("In the history of the common law, there is perhaps no right which is older than a person's right to be free from unwarranted personal contact.").

**17.** *In re Peter,* 108 N.J. 365, 529 A.2d 419, 425 (1987); *Matter of Colyer,* 99 Wash.2d 114, 660 P.2d 738, 743 (1983) ("Historically, an operation without authorization constituted an assault and battery as well as malpractice."); *In Re Storar,* 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981), *cert. denied,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977) (the doctrine of informed consent as the basis for an action in tort is one of widespread recognition); *Schloendorff v. Society of N.Y. Hospital,* 211 N.Y. 125, 105 N.E. 92 (1914) (every person "of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages."); 2 F. Harper, F. James & O. Gray, *The Law of Torts* § 17.1 (2d ed. 1986); Annot., *Patient's Right to Refuse Treatment Allegedly Necessary to Sustain Life,* 93 A.L.R.3d 67 (1979).

**18.** *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973) ("The Constitution does not explicitly mention any right of privacy. [T]he Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices, have ... found ... the roots of that right in the First Amendment; in the Fourth and Fifth Amendments; in the penumbras of the Bill of Rights; in the Ninth Amendment; or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment.") (citations omitted). *See Winston v. Lee,* 470 U.S. 753, 759, 105 S.Ct. 1611, 1613, 84 L.Ed.2d 662 (1985) ("A compelled surgical intrusion into an individual's body for evidence ... implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime."); *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) ("Among the historic liberties ... was a right to be free from and to obtain judicial relief for, unjustified intrusions on personal security."); *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247–48, 22 L.Ed.2d 542 (1969) (First Amendment); *Sibron v. New York,* 392 U.S. 40, 65–66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968) (Fourth Amendment "protects the sanctity of the person against unreasonable intrusions on the part of all government agents"); *Schmerber v. California,* 384 U.S. 757, 772, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966) ("The integrity of an individual's person is a cherished value of our society."); *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886) (the Fourth and Fifth Amendments protect against not only "the breaking of ... doors, and the rummaging of ... drawers" ... but also "the invasion of [the] indefeasible right to personal security, personal liberty and private property ...").

**19.** *Bea v. Greaves,* 744 F.2d at 1393 ("[T]he decision whether to accept treatment with antipsychotic drugs is of sufficient importance to fall within this category of privacy interests protected by the Constitution."); *Rennie v. Klein,* 720 F.2d 266 (3d Cir.1983); *Rogers v. Okin,* 634 F.2d 650, 653 (1st Cir.1980), *vacated for decision according to state law,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982) ("[A] person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs."); *Davis v. Hubbard,* 506 F.Supp. 915 (N.D.Oh.1980) (persons confined in the State's custody have a constitutional right to refuse "treatment" at least in some circumstances which can best be understood as an aspect of "liberty" guaranteed by the due process clause of the Fourteenth Amendment); *In re Peter,* 108 N.J. 365, 529 A.2d 419, 425 (1987); *Large v. Superior Court,* 148 Ariz. 229, 714 P.2d 399 (1986) (freedom from bodily restraint imposed by arbitrary government actions has long been recognized as the core of the liberty protected by due process; to the extent

Where, as here, medication which is potentially mind altering is concerned, the threat to individual rights goes beyond a threat of physical intrusion and threatens an intrusion into the mind. *Bee v. Greaves,* 744 F.2d 1387, 1394 (10th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). The interest in preventing intrusions into one's mind has been recognized as worthy of constitutional protection:

> The makers of our Constitution ... recognized the significance of man's spiritual nature, of his feelings and of his intellect. [They] sought to protect Americans in their beliefs, their *thoughts,* their *emotions* and their *sensations.* They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.

*Stanley v. Georgia,* 394 U.S. 557, 565–66, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969) (quoting *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J. dissenting)) (emphasis added); *Whalen v. Roe,* 429 U.S. 589, 599 n. 24, 97 S.Ct. 869, 876 n. 24, 51 L.Ed.2d 64 (1977) (the concept of a constitutional right of privacy includes "the right of an individual to be free in action, *thought, experience,* and *belief* from governmental compulsion") (emphasis added). The impact of antipsychotic medication upon the mind may be sufficient to undermine the foundations of personality. *Guardianship of Roe,* 383 Mass. 415, 421 N.E.2d 40, 53 (1981). Such mind altering medication has the potential to allow the government to alter or control thinking and thereby to destroy the independence of thought and speech so crucial to a free society. " '[T]he power to control men's minds' is 'wholly inconsistent' not only with the 'philosophy of the first amendment but with virtually any concept of liberty.' " *Davis v. Hubbard,* 506 F.Supp. 915, 933 (N.D. Ohio 1980) (quoting *Stanley v. Georgia, supra,* at 565–66, 89 S.Ct. at 1248 (1969)).

### 2. *The Government's Interests*

Counterbalancing Charters' interests, the government asserts three interests which it claims justify the forcible medication of a mentally ill individual. First, the government claims that it has an interest in preventing violence. Second, the government claims an interest in maintaining the competence of an individual to stand trial. Finally, the government asserts a *parens patriae* interest in protecting the health and well-being of its citizens. In the following discussion we evaluate whether any of the interests asserted justifies forcible treatment with antipsychotic drugs.

As to the government's interest in preventing violence, it is not at all clear from the record that Charters poses any threat of violence in the environment in which he is located. Although Charters has not taken the antipsychotic medication in the three years he has spent at Butner, he has not been involved in a single violent incident. The district court found that:

> While he has *not been physically violent,* he is potentially dangerous and has made verbal threats against others while in custody.

> He continues to be viewed as dangerous *though manageable in his present envi-*

---

that medication is administered forcibly for the purpose of controlling behavior, it is a bodily restraint insubstantially different from the shackles of old). *See Matter of Colyer,* 99 Wash.2d 114, 660 P.2d 738, 742 (1983) ("[A]n adult who is incurably and terminally ill has a constitutional right of privacy that encompasses the right to refuse treatment that serves only to prolong the dying process...."); *Rogers v. Comm'r of the Dep't of Mental Health,* 390 Mass. 489, 458 N.E.2d 308, 314 (1983) (the right to forego treatment has constitutional and common law origins); *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417, 424 (1977) ("As [the constitu-tional right of privacy] reaches out to protect the freedom of a woman to terminate pregnancy under certain conditions ... so it encompasses the right of a patient to preserve his or her right to privacy against unwanted infringements of bodily integrity in appropriate circumstances."); *In re Quinlan,* 70 N.J. 10, 355 A.2d 647, 663 (1976), *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976) ("Presumably [the right of privacy] is broad enough to encompass a patient's decision to decline medical treatment under certain circumstances, in much the same way as it is broad enough to encompass a woman's decision to terminate pregnancy under certain conditions.").

*ronment.* He would not be manageable in a regular hospital unit or in the community, and cannot in his present condition be moved to a less restrictive environment.

(emphasis added).

 In ruling that Charters' capacity for violence provided a basis for forcible medication, the district court considered relevant the potential that Charters would be involved in violence if placed in circumstances other than those in which he is currently detained. However, the consideration of such a hypothetical cannot justify forcible medication. The government may not force an unconsenting individual to hazard the present danger of antipsychotic medication upon a mere supposition that at some future time the individual may become dangerous. Before the government can force an individual to chance such danger, the threat to the government's interest in safety and security must be manifest. Therefore, unless it is determined that, without medication, a patient presents an immediate threat of violence that cannot be avoided through the use of less restrictive alternatives, there is no justification for the intrusion into fundamental liberties that forcible medication represents. We agree with the position taken by the Tenth Circuit in *Bee v. Greaves:*

> In view of the severe effects of antipsychotic drugs, forcible medication cannot be viewed as a reasonable response to a safety or security threat if there exist "less drastic means for achieving the same basic purpose." Our constitutional jurisprudence long has held that where a state interest conflicts with fundamental personal liberties, the means by which that interest is promoted must be carefully selected so as to result in the minimum possible infringement of protected rights.... Thus, less restrictive alternatives, such as segregation or the use of less controversial drugs like tranquilizers or sedatives, should be ruled out before resorting to antipsychotic drugs.

744 F.2d at 1396 (citations omitted); *Large v. Superior Court,* 148 Ariz. 229, 714 P.2d 399, 408 (1986) (*en banc*) (same); *Davis v.* *Hubbard,* 506 F.Supp. 915, 934 (N.D.Oh. 1980).

 The record in the present case plainly indicates that there are alternatives less likely to harm the patient which will prevent violence. The district court found that Charters was *"manageable in his present environment."* Therefore, confinement at Butner or in a comparable state setting is a less intrusive alternative to injecting Charters with antipsychotic drugs which also may prevent violence. In light of the existence of the less intrusive alternative, forcible medication of Charters cannot at present be justified based on the need to prevent violence.

 The second interest which the state claims justifies forcible medication is the interest in ensuring that the defendant is competent to stand trial. For several reasons, we are convinced that the defendant's competence to stand trial is not a strong reason for forcible medication.

 First, there is no certainty that Charters would become competent if medicated. The district court acknowledged that *"there is no way of knowing"* whether the medication would render Charters competent. In view of the significant risk that antipsychotic drugs will cause serious injury to Charters, including a risk of permanent injury, the mere possibility (not even the "probability") that the government might realize its desire to try Charters can be given little weight against countervailing considerations.

Second, it is questionable that the government's interest in having a *fair* trial would be realized by trying a heavily medicated defendant. Fentiman, *Whose Right is it Anyway?: Rethinking Competency to Stand Trial in Light of the Synthetically Sane Insanity Defendant,* 40 U. Miami L.Rev. 1109 (1986); Note, *Antipsychotic Drugs and Fitness to Stand Trial: The Right of the Unfit Accused to Refuse Treatment,* 52 U.Chi.L.Rev. 773 (1985). As the commentators have argued, the real government interest at issue here is not simply an interest in trying an accused; rather, the government's interest is in a fair trial in which the accused's guilt *or*

innocence is correctly determined. Even if we were to assume that forcibly medicating Charters would make him competent to stand trial, there is good reason to question whether the government's interest in a *fair* trial will be well served by placing a heavily medicated defendant before a jury. The sanity of the defendant at the time he committed the crime is usually the primary issue in the trial of an "incompetent" defendant made "competent" through the administration of drugs. However, if the defendant is heavily medicated during the trial, the jury may get a false impression of the defendant's mental state at the time of the crime. *See* Fentiman, *supra;* Note, *Antipsychotic Drugs and Fitness to Stand Trial, supra.*

Just as medication can create misimpressions about the defendant's sanity at the time of the crime, its effects can cause other important misimpressions about the defendant's mental state. For example, two common side effects of antipsychotic medication are akinesia and akathisia. The first makes the defendant apathetic and unemotional. The second makes him agitated and restless. As a result, the jury may be misled by the demeanor of a defendant who appears not to care about the crime (or the victim) or who appears overly anxious at particular moments. Furthermore, as the result of akinesia, the defendant may become so apathetic that he is unwilling (if not unable) to assist his attorney in the defense.[20]

■ Finally, even were it clear that the medication would render Charters competent and there were no threat that the jury would be misled by his demeanor, we do not think that the government's interest in trying Charters would justify administering antipsychotic drugs against his will. Although we do not intend to downplay the importance of the government's obvious interest in resolving the guilt or innocence of a particular defendant, the interest does not permit such a draconian invasion of the individual's freedom and the risk of permanent physical injury.

■ The final interest asserted by the state is the *parens patriae* interest in protecting the health and well-being of its citizens. However, the *parens patriae* interest is not a license for the government to control individual lives in the name of helping its citizens.[21] The exercise of the government's *parens patriae* powers is conditioned upon the patient's inability to make decisions for himself. *Rogers v. Okin,* 634 F.2d 650, 657 (1st Cir.1980), *vacated for decision according to state law,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982); *Davis v. Hubbard,* 506 F.Supp. 915, 935 (N.D.Oh.1980). The *parens patriae* interest cannot justify compelled medication until the need for an individual guardian or custodian has been determined, the guardian or custodian appointed, and the guardian or custodian has recommended that the medication be administered.

a. *The medically competent patient*

■ The government's *parens patriae* goal of protecting the well being of its citizens is realized, where medical treatment of a competent individual is concerned, by allowing the greatest latitude to the decisions of the individual patient. If

---

**20.** It has been argued that the problem of a medicated defendant can be cured by an instruction to the jury. *E.g., People v. Hardesty,* 139 Mich.App. 124, 362 N.W.2d 787, 797 (1984), *appeal dismissed,* —— U.S. ——, 106 S.Ct. 3269, 91 L.Ed.2d 560 (1986). However, the crucial and powerful evidence of the defendant's demeanor may not be sufficiently erased by a curative instruction. Fentiman, *supra,* at 1134–37. Furthermore, the fact that a curative instruction might solve the problem does not change the fact that the government cannot be said to have a strong interest in holding a trial in which the risk of misleading the jury is so palpable that it is anticipated in advance of the

trial. Finally a jury instruction cannot ameliorate the negative impact of antipsychotic drugs on a defendant's ability to consult with counsel. *Id.*

**21.** *See Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 572–73, 72 L.Ed. 944 (1928) ("Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent.... The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.") (Brandeis, J., dissenting).

an individual is competent to make medical decisions, the individual's informed decision presumptively is the best decision for that individual—for the individual is in the best position thoroughly to assess and evaluate the circumstances of his own life, the effect that different medical treatments will have on the quality of that life, and ultimately to make the value judgments that individuals in our society have a right to make for themselves. Accordingly, where a competent patient is concerned, the *parens patriae* interest is best served by respecting the patient's choice of a treatment (or nontreatment) alternative and cannot justify medicating the individual against his will.[22]

Further, in accordance with the well settled principle that "the law will presume sanity rather than insanity, competency rather than incompetency; [and] ... that every man is sane and fully competent until satisfactory proof to the contrary is presented," 41 Am.Jur.2d, *Incompetent Persons*, § 129, p. 665 (1968), Charters is entitled to the benefit of a presumption that he is medically competent until such time as his incompetency is properly adjudicated. S. Brakel, J. Parry & B. Weiner, *The Mentally Disabled and the Law* 341 n. 167 (3d ed. 1985) ("In almost every state the mentally disabled person is considered competent unless there is a separate hearing declaring him incompetent."). The fact that Charters has been found incompetent to stand trial is not dispositive of his medical competency. *See infra*, note 23. Until such time as Charters is found

medically incompetent, his decision to reject antipsychotic drugs is dispositive.

The district court determined that Charters was medically incompetent. However, the legal and factual basis for that determination was inadequate. The court equated legal competence—competence to stand trial—with medical competence—competence to make decisions concerning one's own medical care. It is plain that these two capabilities are not the same.[23] Furthermore, the factual basis for the court's decision was the testimony of Dr. Johnson that Charters had acted in a less than medically ideal fashion.[24] It hardly needs to be said that if a person can be declared incompetent based on disagreement with a medical choice he has made, the right to make personalized and individual decisions concerning one's own body would become a nullity.

> The very foundation of the doctrine [of informed consent] is every one's right to forego treatment or even cure if it entails what *for him* are intolerable consequences or risks, however warped or perverted his sense of values may be in the eyes of the medical profession, or even of the community, so long as any distortion falls short of what the law regards as incompetency. Individual freedom here is guaranteed only if people are given the right to make choices that would generally be regarded as foolish ones.

2 F. Harper, F. James, & O. Gray, *The Law of Torts* § 17.1 (2d ed 1986).[25] G. Morris, *Dr. Szasz or Dr. Seuss: Whose Right to*

---

**22.** That the state may not force a choice on an individual does not mean that the state has no interest in influencing the exercise of an individual's medical decision, for example through educational efforts, provision of medical services or economic incentives.

**23.** *See Rogers v. Comm'r of the Dep't of Mental Health*, 390 Mass. 489, 458 N.E.2d 308, 313 (1983) ("A person may be competent to make some decisions but not others."); Freedman, *Competence, Marginal and Otherwise: Concepts and Ethics*, 4 Intern.J. of L. & Psychiatry 53, 56 (1981) ("The test of competency varies from one context to another. In general to be considered competent an individual must be able to comprehend the nature of the *particular conduct* in question and to understand its quality and its consequences.") (quoting Roth, Meisel & Lidz,

*Tests of Competency to Consent to Treatment,* 134 Am.J. Psychiatry 279 (1977)) (emphasis added); Hardisty, *Mental Illness: A Legal Fiction,* 48 Wash.L.Rev. 735 (1973) (a person may be considered competent for some legal purposes and not for others); Friedman, *Legal Regulation of Behavior Modification,* 17 Ariz.L.Rev. 39, 76 (1975) (capacity, like voluntariness, is a requirement of variable demands).

**24.** It should be noted that no independent guardian or custodian appeared on Charters' behalf.

**25.** To require a patient to accept whatever treatment is objectively recommended is to refuse to honor religious beliefs that may lead a patient to choose in ways that appear irrational to oth-

*Refuse Mental Health Treatment,* 9 J. of Psychiatry & Law, 283, 290 (1981) (deciding whether a patient is competent by determining whether he agrees with the psychiatrist's proposed treatment undermines the concept of patient autonomy and abrogates the right to refuse treatment). There must be more on which to base a conclusion that a person is incompetent than the mere fact that the person has acted in a manner which to an outside observer appears less than advantageous.

Upon remand of the present case, the district court must properly determine whether Charters is competent to make decisions concerning his medical treatment. To determine Charters' competence, the district court should evaluate whether Charters has followed a rational process in deciding to refuse antipsychotic medication and can give rational reasons for the choice he has made.[26] Latitude must be given in defining a "rational reason," supporting Charters' decision. For example, it would

ers. A religious belief may sometimes define a patient's "best interest" in a manner that is inconsistent with medical recommendations. The courts generally recognize the right of a competent patient to refuse treatment, even when the refusal means death, where the refusal is based on a religious doctrine. S. Brakel, J. Parry & B. Weiner, *The Mentally Disabled and the Law* 342 (3d ed. 1985) (citing *In re Osborne,* 294 A.2d 372 (D.C.1972); *In re Brooks' Estate,* 32 Ill.2d 361, 205 N.E.2d 435 (1965)).

26. The question of how to define medical competence is one that has rarely arisen in litigation. Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment,* 72 N.W.U.L.Rev. 461, 490 n. 172 (1977); Roth, Meisel, Lidz, *Tests of Competency to Consent to Treatment,* 134 Am.J. Psychiatry 279 (1977) ("There is a dearth of legal guidance illuminating the concept of competency to consent to medical treatment. Nevertheless competency plays an important role in determining the validity of a patient's decision to undergo or forego treatment."); Friedman, *Legal Regulation of Applied Behaviour Analysis in Mental Institutions and Prisons,* 17 Ariz.L.Rev. 39, 76 (1975) ("Defining capacity to consent is, along with defining voluntariness, one of the thorniest of all issues involved in the regulation of applied behavior analysis."); Note, *Informed Consent and the Dying Patient,* 83 Yale L.J. 1632, 1653 (1974) ("Judicial opinions dealing with informed consent generally do not articulate tests for competency."). An annotation collecting cases on the subject of competency to consent to medical treatment cites only five cases, all of which deal with tort suits charging that unconsented medical treatment constituted a battery. Annot., *Mental Competency of Patient to Consent to a Surgical Operation or Medical Treatment,* 25 A.L.R.3d 1439, 1440 (1969 & Supp. 1987). *Cf. Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (the test for competency to stand trial must be whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."); *Grannum v. Berard,* 70 Wash.2d 304, 422 P.2d 812, 815 (1967) (to overcome the presumption of competency, proof

must be had by clear, cogent and convincing evidence that the patient does not comprehend the nature, terms and effect of a consent given for a surgical operation); *In Re Yetter,* 62 D & C 2d 619 (Pa.1973) (irrational decision to refuse treatment based on the conclusion that surgery for cancer caused death of family member some fifteen years later allowed to stand).

The standard adopted here has been advanced by Freedman, *Competence, Marginal & Otherwise,* 4 Inter.J. of L. & Psychiatry 53, 59 (1981). As Freedman explains, competency represents a delicate balance of individual freedom and the need to protect and care for those who cannot care for themselves. A test which leans too far in the direction of individual freedom, for example by deferring to individual choice whenever an individual is capable of expressing a preference, fails to afford adequate care and protection. On the other hand, a test which is overly protective, for example, which evaluates competency according to the results of decisions, is too paternalistic and poses a tremendous threat to the right of the individual to make choices which reflect his unique concerns. The test adopted here attempts to strike a balance between these extremes, by permitting the court to evaluate an individual's decision-making process to a limited degree. *See* Friedman, *Legal Regulation of Behavior Modification,* 17 Ariz.L. Rev. 39, 77 (1975) ("Under too lax a standard of competency, persons will be allowed to act in ways which may be viewed as being contrary to their best interests. Under too strict a standard, the opportunity for self-determination may be undermined and personal integrity denigrated by the paternalism of the state.").

A proposed model law for defining competency to consent to medical treatment approved by the American Psychiatric Association is as follows:

"*lacks capacity to make an informed decision concerning treatment*" means that the person, by reason of his mental disorder or condition, is unable, despite conscientious efforts at explanation, to understand basically the nature and effects of hospitalization or treatment or is unable to engage in a rational decisionmaking process regarding such hospitalization or treatment, as evidenced by inability to weigh the possible risks and benefits.

not be a competent decision based on rational reasons if Charters refused medication out of a denial that he suffers from schizophrenia or out of a belief that the drugs will have effects that no rational person could believe them to have. However, Charters' fear that if medicated he, though by no means cured, would be discharged into a less protective environment, as well as the indisputable risk that he may suffer substantial and irreversible harm, may each provide a rational basis for refusing the medication if supported by the facts. Indeed, should Charters refuse antipsychotic medication because he believes that the risks of side effects and the possibility of permanent injury outweigh the possible benefits of that medication to him, it will be difficult for him to be found incompetent by virtue of that judgment.

On the other hand, if Charters is found medically incompetent, there is a further question of what procedural and substantive protections are required before he is subjected to forcible medication.

### b. *The medically incompetent patient*

A finding that Charters is incapable of rendering a decision concerning his medical treatment does not extinguish his right to be free of nonconsensual invasions of his person. At the same time, it is obvious that medical treatment should not automatically be withheld from such persons simply because they cannot make a competent decision to consent to that treatment. In many cases, the medical treatment may be highly beneficial, and, because the patient is incapable of making the judgment, it must be decided what technique should be used for making the judgment on the individual's behalf.

Based on judicial decisions in related contexts, there are at least three possible answers to the question. First, the professional judgment standard announced in *Romeo*. Second, what has been termed "substituted judgment," a decisional process whereby an attempt is made to ascertain what an incompetent patient would have done if he were competent. Third, a standard based on the patient's best interests.

For the reasons outlined earlier, we have concluded that the matter before the Supreme Court in *Romeo* was quite different from the instant case and that deference to professional judgment was far more appropriate in that context. The decision here, whether to hazard the substantial risks of a course of antipsychotic medication, is an individual decision, not normally delegated to professionals. Furthermore, the use of antipsychotic medication may present a substantial conflict of interest for institutional professionals because, quite apart from its therapeutic benefits, the medication serves the institutional goals of maintaining control and ameliorating staffing costs.

The second approach followed by the courts is the use of a substituted judgment test. Courts employing substituted judgment have required that if a patient is medically incompetent, the decision-maker must attempt to determine what the patient would have done if he were competent. To do otherwise, it has been argued, is to deprive the incompetent patient of rights which are afforded competent patients, by ignoring their uniqueness and imposing upon them the views of a hypothetical majority or "reasonable man." *Rogers v. Comm'r of the Dep't of Mental Health*, 390 Mass. 489, 458 N.E.2d 308, 316 (1983); *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417 (1977).

Although the substituted judgment approach is commendable in its attempt to afford respect to the values of the individual, some have raised important objections to it. *In re Storar*, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981), *cert. denied*, 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); *Conservatorship of*

Stromberg & Stone, *A Model State Law on Civil Commitment of the Mentally Ill*, 20 Harv.J.Legis. 275, 301 (1983). The proposed Model Law allows the patient more latitude than the standard proposed here. Only a patient who is "unable to pay attention to and assimilate information" would be declared incompetent under the model law.

*Valerie N.,* 40 Cal.3d 143, 219 Cal.Rptr. 387, 415–18, 707 P.2d 760, 788–91 (1985) (Bird, J., dissenting); Tribe, *American Constitutional Law* 934–37 & n. 11 (1978). Criticisms of the substituted judgment doctrine have pointed out that it is a legal fiction. Substituted judgment imagines that it is possible to predict what a person would do if competent, often in cases where the person has never in his life been competent.[27] Furthermore, instead of protecting a patient, substituted judgment may camouflage the basis of a decision whether or not to treat, putting the patient at substantially greater risk of an incorrect decision than he would have been had the inquiry focused directly on his best interests.

The argument against the use of the substituted judgment standard can be answered in cases where it is possible clearly to ascertain what a patient would have done if he were competent. In those circumstances, substituted judgment loses some of its fictional character and the likelihood is substantially increased that the individual's judgments and value choices are being respected, and the decision maker is not simply making his, her or its own judgment. For example, if a very observant member of a religious order that does not condone medical treatment suddenly became incompetent, it would be reasonable to conclude by a substituted judgment process that that individual should not be medicated. In this and other cases where the evidence to support a substituted judgment determination is clear and convincing, there is little merit to the criticisms of the substituted judgment approach. Conse-

quently, if the clear and convincing evidence standard can be met, it is appropriate to honor the determination that the incompetent patient would have made, just as the wishes of a competent patient must be honored. If, finding Charters to be medically incompetent, the district court can ascertain by clear and convincing evidence whether Charters would accept antipsychotic medication if he were competent, it should effectuate the substituted judgment. A guardian or a custodian might be appointed to assist the court in evaluating the patient's wishes.

■■■■■ The third approach followed by some courts, and the approach we adopt where there is not clear and convincing evidence of what the patient's choice would be, is the best-interests-of-the-patient test. If it is not possible to ascertain what Charters would have done were he competent, then the district court should ascertain whether medication with antipsychotic drugs is in Charters' best interests. In the absence of other valid guidelines for decision, it is appropriate to presume that an incompetent individual would choose in a manner similar to others in the same circumstance and opt for what is in his best interests. Such a presumption is the best method of protecting the patient's rights. Furthermore, the government's *parens patriae* interest in the well being of its citizens converges with the best interests choice and there is no need to view the two as competing.

■■■■■ It has been argued that requiring prior judicial approval of forcible medi-

---

27. Professor Tribe poses some hypotheticals which illustrate the problems with substituted judgment:

[A] sleeping person has rights, as does someone who has temporarily lost consciousness. On the other hand, someone who has died cannot be said to have "rights" in the usual sense; although a person may have a right to determine how her body is dealt with after her death, even that is a troublesome concept. Consider, for example, an individual who opposes a decision to cremate her brother in accord with his will, claiming that she would suffer severe anguish if the will were carried out. Whose rights are involved? Might it depend on the religious beliefs of the deceased? To be sure, Karen

Quinlan was not "dead" in most of the increasingly multiple senses of that term, but the task of giving content to the notion that she had rights, in the face of the recognition that she could make no decisions about how to exercise any such rights, remains a difficult one.
Tribe, *American Constitutional Law* 936 n. 11 (1978).

More simply stated, asking what an incompetent person would do if he were competent is similar to asking whether "if it snowed all summer would it then be winter?" *Matter of Storar,* 52 N.Y.2d 363, 438 N.Y.S.2d 266, 275, 420 N.E.2d 64, 72–73 (1981), *cert. denied,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981).

cation imposes a needless and unwieldy obstacle to proper and prompt treatment. However, other factors strongly suggest that prior judicial approval of forcible medication must be required with respect to an individual in Charters' circumstances. If the medication decision were given entirely to institutional officials (including medical officials at these institutions), even subject to the guidelines set forth by the court, there is a possibility that a conflict of interest would interfere with the officials' assessment of the necessity of forcible treatment. Antipsychotic medication is sometimes used as an instrument of maintaining institutional control. *Rogers v. Comm'r of the Dept. of Mental Health*, 390 Mass. 489, 458 N.E.2d 308, 320 (1983); Note, *A Common Law Remedy for Forcible Medication of the Institutionalized Mentally Ill*, 82 Colum.L.Rev. 1720, 1721 n. 9 (1982). Antipsychotic medication may ease institutional budgets by making it easier to manage the patient population and allowing the institution to employ a smaller staff (or in Butner's case to be free of Charters). Administrators may thus be caught between the desire to maintain control and save money, and the desire to provide appropriate treatment for the patient, including respecting his constitutional rights. Because of the potential for a conflict of interest, the decision whether forcibly to medicate a patient must be made by an independent arbitrator such as a federal court[28] (aided by an impartial guardian or custodian).[29]

▮ Finally, we limit our ruling to the case presently before us. It is possible to envision circumstances different from those here, in which the government's interests would be sufficiently compelling to override a patient's[30] decision to refuse treatment. So, for example, where violence cannot otherwise be prevented except by the forcible administration of antipsychotic drugs (though such an occurrence is difficult to imagine) the government's interest in ensuring the safety and security of its institutions will be increased. Similarly, if without medication a patient will suffer a severe, immediate and irreversible deterioration, the government's *parens patriae* interest will be more urgent. In those circumstances, forcible medication of a competent patient will perhaps be justifiable. We have no occasion to determine whether some future circumstance might arise in which it will be legitimate for the government to override a competent individual's decision to refuse treatment.

## CONCLUSION

In summary, on remand, the district court should conduct the following inquiries: (1) The court should determine whether Charters may be continued in a federal treatment facility under 18 U.S.C. § 4246; (2) If the court finds that Charters can remain in federal custody, the court should then evaluate whether Charters is competent to make decisions concerning his own medical care. If the court determines that Charters is medically competent, he must be permitted to refuse antipsychotic medication. In making the determination of medical competence, the court should evaluate whether Charters has followed a rational process and can give rational reasons for his choice to refuse antipsychotic

28. Nor will judicial oversight slow the decisional process and stand as an obstacle to proper administration and patient care. To avoid the problem of running to court each time forcible medication is contemplated, the court can approve a reasonable treatment plan effective over a period of time and periodically reviewed. Finally, relatively few patients refuse to take the recommended medication. Brushwood & Fink, *Right to Refuse Treatment With Antipsychotic Drugs,* 42 Am.J. Hospital Pharmacy 2709 (1985). The requirement that the treatment of the patients who do refuse be evaluated by the court does not place a significant burden on institutional resources.

29. In light of the fact that Charters is represented by an attorney, we cannot say that, on the record before us, the Constitution requires that a guardian be appointed to protect Charters' rights. On remand the district court should evaluate whether a guardian should be appointed under Rule 17(c), Fed.R.Civ.P. 17(c).

30. We address only the circumstances of the unconvicted defendant and express no views concerning the rights of convicted prisoners facing forcible treatment with antipsychotic drugs.

medication; (3) If the court determines that Charters is not medically competent, it should determine whether there is clear and convincing evidence of what Charters would do if he were competent; (4) If a substituted judgment cannot be made, the court should order forcible medication only upon finding that it is in Charters' best interests.

REVERSED AND REMANDED.